**Nos. 15-1218, 15-1221, 15-1271, 15-1272**

*United States Court of Appeals for the First Circuit*

FRANKLIN CALIFORNIA TAX-FREE TRUST, *ET AL.*,

*Plaintiffs-Appellees,*

v.

THE COMMONWEALTH OF PUERTO RICO, *ET AL.*,

*Defendants-Appellants.*

BLUEMOUNTAIN CAPITAL MANAGEMENT, LLC,

*Plaintiff-Appellee,*

v.

ALEJANDRO GARCIA-PADILLA, IN HIS OFFICIAL CAPACITY
AS GOVERNOR OF THE COMMONWEALTH OF PUERTO RICO, *ET AL.*,

*Defendants-Appellants.*

**On Appeal from the United States District Court
for the District of Puerto Rico (Besosa, J.)
Civil Action Nos. 3:14-cv-1518 & 3:14-cv-1569**

# BRIEF FOR THE PUERTO RICO ELECTRIC POWER AUTHORITY AS AMICUS CURIAE SUPPORTING APPEAL OF THE COMMONWEALTH GOVERNMENT DEFENDANTS-APPELLANTS AND URGING REVERSAL

Jorge R. Roig (76786)
Joanne A. Tomasini-Muñiz (76781)
GONZÁLEZ, MACHADO & ROIG, LLC
Citibank Tower
Suite 601
252 Ponce de León Avenue
San Juan, Puerto Rico 00918
Tel.: (787) 773-6363
Fax: (888) 450-9876

Lawrence B. Friedman (1143082)
Richard J. Cooper (1168943)
Lewis J. Liman (1168942)
Sean A. O'Neal (1168944)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Tel.: (212) 225-2000
Fax: (212) 225-3999

March 16, 2015

*Attorneys for the Puerto Rico Electric Power Authority*

## CORPORATE DISCLOSURE STATEMENT

In compliance with Fed. R. App. P. 29(c)(1) and Local Rule 26.1(a), the

Puerto Rico Electric Power Authority ("PREPA") states that it is a public

corporation and government instrumentality of the Commonwealth of Puerto Rico

(the "Commonwealth") which was organized pursuant to the Puerto Rico Electric

Power Authority Act in 1941, as amended, reenacted and supplemented (the

"PREPA Act") for the purpose of conserving, developing and utilizing Puerto

Rico's energy resources.  PREPA further states that it does not have a parent

corporation, and that there is no publicly held corporation that has a 10% or greater

ownership interest in PREPA.

# Table of Contents

STATEMENT OF IDENTITY AND INTEREST OF *AMICUS CURIAE* ............. 1

STATEMENT REGARDING AUTHORSHIP OF *AMICUS CURIAE* BRIEF ...... 3

SUMMARY OF ARGUMENT ................................................................. 3

ARGUMENT ...................................................................................... 6

    I.    IT IS UNDISPUTED THAT THE COMMONWEALTH HAS THE POWER UNDER THE U.S. CONSTITUTION TO ENACT LAWS TO PERMIT ITS PUBLIC CORPORATIONS TO ADJUST THEIR DEBTS AND PROVIDE FOR THE ORDERLY AND FAIR ENFORCEMENT AND RESTRUCTURING OF THEIR DEBTS .... 6

    II.    THE DISTRICT COURT ERRED IN HOLDING THAT SECTION 903(1) OF THE BANKRUPTCY CODE PREEMPTS THE COMMONWEALTH'S POWER TO PASS EMERGENCY LEGISLATION IN THE INTEREST OF THE CREDITORS, CUSTOMERS AND OTHER CONSTITUENTS OF ITS PUBLIC CORPORATIONS ................................................................. 8

        1.    The District Court Misapprehended And Misapplied Express Preemption Law ..................................................... 9

        2.    The District Court's Ruling Frustrates The Overarching Goal Of The Bankruptcy Code To Provide An Orderly And Fair Process For Creditors To Collect On Their Claims ................. 11

        3.    The District Court Also Misapprehended And Misapplied Section 903................................................................. 14

        4.    The District Court's Interpretation Is Inconsistent With The Purpose Of Section 903 And Its Legislative History............... 19

CONCLUSION................................................................................... 25

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) .................................... 27

CERTIFICATE OF SERVICE .................................................................. 28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## <u>Cases</u>

Antilles Cement Corp. v. Fortuño,
670 F.3d 310 (1st Cir. 2012) .......................................................................... 10, 25

Arizona v. United States,
132 S. Ct. 2492 (2012) ..................................................................................... 11

Barnhart v. Thomas,
540 U.S. 20 (2003) ........................................................................................... 16

Calero-Toledo v. Pearson Yacht Leasing Co.,
416 U.S. 663 (1974) ......................................................................................... 7

Crosby v. National Foreign Trade Council,
530 U.S. 363 (2000) ......................................................................................... 12

CTS Corp. v. Waldburger,
134 S. Ct. 2175 (2014) ..................................................................................... 9

Faitoute Iron & Steel Co. v. Asbury Park,
316 U.S. 502 (1942) ......................................................................................... 23

Gen. Dynamics Land Sys., Inc. v. Cline,
540 U.S. 581 (2004) ......................................................................................... 14

Hibbs v. Winn,
542 U.S. 88 (2004) ........................................................................................... 17

Highland Realty, Inc. v. Superior Court of Puerto Rico,
103 D.P.R. 306, 3 P.R. Offic. Trans. 426 (1975) ........................................... 10

Home Building & Loan Ass'n v. Blaisdell,
290 U.S. 398 (1934) ......................................................................................... 5

Kuehner v. Irving Trust Co.,
299 U.S. 445 (1937) ......................................................................................... 12

Medtronic, Inc. v. Lohr,
518 U.S. 470 (1996) ......................................................................................... 9

Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp.,
485 U.S. 495 (1988)..................................................................... 9

Rodriguez v. Popular Democratic Party,
457 U.S. 1 (1982)......................................................................... 7

Stenberg v. Carhart,
530 U.S. 914 (2000)..................................................................... 17

Straton v. New,
283 U.S. 318 (1931)..................................................................... 12

Sturges v. Crowninshield,
17 U.S. 122 (1819)....................................................................... 5, 6

United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.,
484 U.S. 365 (1988)..................................................................... 14

United States v. Morrow,
266 U.S. 531 (1925)..................................................................... 16

United States v. Walsh,
154 F. 770 (1st Cir. 1907)............................................................ 16

Utility Air Regulatory Grp. v. EPA,
134 S. Ct. 2427 (2014)................................................................. 14

Yates v. United States,
S. Ct. No. 13-7451, slip op. at 10 (Feb. 25, 2015)........................ 14

Young v. Higbee Co.,
324 U.S. 204 (1945)..................................................................... 12

**Other Authorities**

Andrew Bary, *Troubling Winds* BARRONS, August 26, 2013......................... 4

H.R. Rep. No. 686, 94th Cong., 2d Sess. 4 (1976)......................................... 13, 21

Franklin Templeton Investments, Franklin New York Tax-Free Income
Fund:  Summary Prospectus 2, Oct. 1, 2013 ................................................. 4

Mary Williams Walsh, *Facing debt crisis, Puerto Rico may seek unprecedented lifeline from U.S.*, INTERNATIONAL HERALD TRIBUNE, Oct. 9, 2013 ............................................................................................... 4

Oppenheimer Rochester on Puerto Rico Downgrades: An Update, Rochester Communique, Feb. 12, 2014, available at, https://www.oppenheimerfunds.com/articles/article_04-27-11-134834.jsp?lnk=LNAW644CB ......................................................... 4

S. Rep. No. 911, 75th Cong., 1st Sess. 3 (1937)............................................ 13, 22

Thomas Moers Mayer, State Sovereignty, State Bankruptcy, and a Reconsideration of Chapter 9, 85 AM. BANKR. L.J. 363, 379 & n.84 (Fall 2011) ............................................................................................... 17

## STATEMENT OF IDENTITY AND INTEREST OF *AMICUS CURIAE*

PREPA is a public corporation and government instrumentality of the Commonwealth that was organized in 1941 pursuant to the PREPA Act. PREPA was created to conserve, develop and utilize Puerto Rico's energy resources to promote the general welfare of the island's residents and to increase commerce and prosperity.

PREPA performs a critical public function. Virtually the entire population of Puerto Rico relies on PREPA's electricity for its daily needs – medical care, light, refrigeration, cooling, communication and running water. It supplies and delivers virtually all of the electric power consumed in the Commonwealth, including by residences, businesses and government offices, public agencies and other providers of essential services, such as schools and hospitals.

PREPA has a paramount interest in the outcome of this litigation. PREPA relies heavily on debt financing for the performance of its public functions, including its capital and operating expenditures. PREPA currently has outstanding 25 series of bonds, totaling over $8.3 billion, and lines of credit totaling $700 million. PREPA is required to pay approximately $435 million in bond principal and interest on July 1, 2015.

PREPA currently faces both long-term and short-term liquidity challenges. If PREPA cannot adjust its debt in an organized and timely fashion, it may be

unable to purchase fuel, pay employees, maintain its plants, comply with environmental regulations, operate its transmission and distribution lines and serve its customers. In that event, PREPA may be forced to ration its existing fuel supply and employ rolling blackouts. That would severely threaten public health, safety and welfare, and would cause chaos across the Commonwealth.

PREPA has issued, and its bondholders have purchased PREPA's bonds, based on a shared understanding in law that, if PREPA becomes financially distressed such that it may be unable to pay its debt as it comes due, the Commonwealth would have the means, through its legislative function, to provide a mechanism by which PREPA could restructure its debt in the collective interest of all of PREPA's creditors, customers and other constituents.

The Recovery Act that is the subject of this appeal provides a legislative means by which PREPA can adjust its contractual obligations in an organized manner that is in the best interests of and fair to *all* creditors, and avoid having a small minority of its creditors take actions that would irreparably harm PREPA, and thus irreparably harm the Commonwealth, its citizens and the collective interests of PREPA's creditors.

## STATEMENT REGARDING AUTHORSHIP OF *AMICUS CURIAE* BRIEF

PREPA and its counsel are the sole authors of this brief. No party, party's counsel or other person has authored this brief in whole or in part, or contributed money that was intended to fund preparing or submitting this brief.

## SUMMARY OF ARGUMENT

The District Court erred in ruling that a 1984 amendment to the Bankruptcy Code – which defined "State" to include "Puerto Rico, except for the purpose of defining who may be a debtor under chapter 9 of this title," 11 U.S.C. § 101(52) – causes Section 903 to preempt the Recovery Act and precludes the Commonwealth from creating an orderly procedure to permit its public corporations to adjust their debts in a manner that is fair to creditors. The District Court's decision is based on a fundamental misunderstanding of the principles of preemption and the overarching goals of the Bankruptcy Code. It also misreads the plain language of Section 903(1), which is limited in its application to the 50 States, whose municipalities are eligible to invoke Chapter 9 as debtors. In addition, it is premised on a misapprehension of the purpose of, and the legislative background to, that section, which was intended to ensure that those States whose municipalities *can* invoke Chapter 9 do not enact conflicting statutes. It was not intended to bar the Commonwealth, whose municipalities are *not* eligible to invoke

3

Chapter 9, from providing its municipalities with a means for debt adjustment

relief.

The District Court's ruling is also inconsistent with the shared understanding

of PREPA and its bondholders, based both on the law today and at the time

PREPA issued and its bondholders purchased their bonds.[1]  The Supreme Court

has long held that "the laws which subsist at the time and place of the making of a

---

[1] Plaintiffs cannot claim surprise that the Commonwealth exercised its police power to establish a framework for the orderly payment of PREPA's debt.  The Trust Agreement governing the bonds recognizes that the Commonwealth could enact a restructuring law, because it provides that the commencement of a proceeding under such a law would be an event of default. Moreover, when the 2013A PREPA bonds held by Plaintiffs were issued, observers were already noting that Puerto Rico might restructure its debt in light of its fiscal challenges, and Puerto Rico's debt has been trading at distressed levels since August 2013, based on expectations of an imminent restructuring.  See, e.g., Mary Williams Walsh, *Facing debt crisis, Puerto Rico may seek unprecedented lifeline from U.S.*, INTERNATIONAL HERALD TRIBUNE, Oct. 9, 2013 ("In September [2013], mutual funds and other institutions began to sell big blocks of its bonds, driving their prices down.  That led to buying by hedge funds hoping to profit on a possible [Puerto Rico] restructuring."); Andrew Bary, *Troubling Winds*, BARRONS, August 26, 2013 ("If the government's moves don't work, and its borrowing costs stay stubbornly high, Puerto Rico might well have to restructure its debt somewhere down the road, demurrals notwithstanding.").

Plaintiffs themselves publicly acknowledged that Puerto Rico might restructure its debt.  In October 2013, the Franklin Plaintiffs stated that Puerto Rico's "financial difficulties could reduce its ability to access financial markets, *potentially increasing the likelihood of a restructuring or default* for Puerto Rican municipal securities that may affect the Fund's investments and its performance."  Franklin Templeton Investments, Franklin New York Tax-Free Income Fund: Summary Prospectus 2, Oct. 1, 2013 (emphasis added).  In October 2013 the Franklin Plaintiffs also publicly acknowledged the inherently risky nature of investing in municipal securities, such as PREPA bonds, and the risk of substantial losses if Puerto Rico could not honor its debt obligations.  Franklin Templeton Investments, Franklin New York Tax-Free Income Fund: Summary Prospectus 2, Oct. 1, 2013.  Similarly, in September 2013, Oppenheimer specifically warned its investors about the riskiness of PREPA Bonds:  "The funds invest in below-investment grade debt securities, which may entail greater credit risks.  These securities (sometimes called 'junk bonds') may be subject to greater price fluctuations and risks of loss of income and principal than investment-grade municipal securities."  Oppenheimer Rochester on Puerto Rico Downgrades:  An Update, Rochester Communique, Feb. 12, 2014, available at, https://www.oppenheimerfunds.com/articles/article_04-27-11-134834.jsp?lnk=LNAW644CB.

contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms." Home Building & Loan Ass'n v. Blaisdell, 290 U.S. 398, 429-30 (1934) (internal quotation marks omitted). The background law incorporated into PREPA's bonds includes the shared expectation among PREPA and its bondholders that, if PREPA were to face the risk of being unable to pay its debts as they come due, the Commonwealth would have the power under the Constitution and federal law to adopt a legislative mechanism to allow PREPA to adjust its obligations in the collective interest of all of its creditors, customers and other constituents, as long as that mechanism does not violate the individual rights of any debtholder.[2] Nothing in the Bankruptcy Clause limits the ability of the Commonwealth to adopt a law permitting its public corporations to adjust their debts. The court below correctly recognized that the federal Constitution preserved that power in the States. See Op. & Order at 45 (quoting Sturges v. Crowninshield, 17 U.S. 122, 199 (1819)). And, if the Bankruptcy Code were properly understood, there is also nothing in Section 903 that restricts the Commonwealth's power in a way that the Constitution does not. Section 903 does not disrupt the Commonwealth's ability to respond to the current fiscal emergency by enacting a statute such as the Recovery Act in the collective interest of PREPA's creditors, customers and other constituents.

---

[2] Of course, the law would need to be consistent with the Contract Clause, but that issue is not before the Court.

## ARGUMENT

I.  **IT IS UNDISPUTED THAT THE COMMONWEALTH HAS THE POWER UNDER THE U.S. CONSTITUTION TO ENACT LAWS TO PERMIT ITS PUBLIC CORPORATIONS TO ADJUST THEIR DEBTS AND PROVIDE FOR THE ORDERLY AND FAIR ENFORCEMENT AND RESTRUCTURING OF THEIR DEBTS**

The District Court recognized that the Bankruptcy Clause of the U.S. Constitution does not prevent States and the Commonwealth from enacting bankruptcy discharge laws to provide for the orderly and fair enforcement and restructuring of debts by their public corporations.  Op. & Order at 45.  As the Supreme Court long ago held, "the states may, until that power shall be exercised by congress, pass laws concerning bankrupts . . . ."  <u>Sturges v. Crowninshield</u>, 17 U.S. 122, 199 (1819).

For the better part of the Nation's history, then, the power to pass laws providing for the orderly and fair enforcement and restructuring of debt has resided in the States.  Congress did not pass the first permanent federal bankruptcy law until 1898.  Act of July 1, 1898, ch. 541, 30 Stat. 544 (repealed 1978).  With the exception of periodic temporary federal bankruptcy statutes passed in response to financial crises, <u>see, e.g.</u>, Act of Aug. 19, 1841, ch. 9, 5 Stat. 440 (repealed 1843), the States filled the void left by the absence of a federal bankruptcy regime, passing laws prescribing means for the restructuring of debt, <u>see, e.g.</u>, Act of Apr. 12, 1813, ch. 98 (R.L.), 1813 N.Y. Laws 450.

Those laws are essential to protect the health, safety and welfare of the States' citizens.  They ensure the orderly, fair and reasonable management of debt, facilitate borrowing and the flow of capital, and enable private and municipal debtors alike to continue their operations in periods of crisis and necessity.

The District Court did not dispute (nor could it) that the Commonwealth enjoys those powers no less than the 50 States.  Congress has long recognized the Commonwealth's autonomy to legislate on matters of local concern, and specifically the Commonwealth's "power to create, consolidate, and reorganize [its] municipalities so far as may be necessary . . . ."  48 U.S.C. § 821; see Rodriguez v. Popular Democratic Party, 457 U.S. 1, 8 (1982) ("Puerto Rico, like a state, is an autonomous political entity, sovereign over matters not ruled by the Constitution.") (internal quotation marks omitted); see also Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 671-72 (1974) ("Pursuant to [its] constitution, the Commonwealth now elects its Governor and legislature; appoints its judges, all cabinet officials, and lesser officials in the executive branch; sets its own educational policies; determines its own budget; and amends its own civil and criminal code.") (internal quotation marks omitted).  It would thus be anomalous to conclude that Puerto Rico now lacks the very police powers – including the ability to pass laws to address local fiscal emergencies – that it has enjoyed for decades.

II.    **THE DISTRICT COURT ERRED IN HOLDING THAT SECTION 903(1) OF THE BANKRUPTCY CODE PREEMPTS THE COMMONWEALTH'S POWER TO PASS EMERGENCY LEGISLATION IN THE INTEREST OF THE CREDITORS, CUSTOMERS AND OTHER CONSTITUENTS OF ITS PUBLIC CORPORATIONS**

The District Court nonetheless held that, under principles of express preemption, a proviso to Section 903 of Chapter 9 of the Bankruptcy Code evidences Congress's intent to preclude the Commonwealth from enacting a law permitting its public corporations to adjust their debts and provide for the orderly enforcement and restructuring of their debts.  The District Court's syllogism is as follows: (a) Section 903 — entitled "Reservation of State power to control municipalities" and providing that nothing in Chapter 9 "limit[s] or impair[s] the power of a State to control, by legislation or otherwise, a municipality of or in such State" — contains a proviso in Section 903(1), which provides that "a State law prescribing a method of composition of indebtedness of such municipality may not bind any creditor that does not consent to such composition"; (b) the Bankruptcy Code defines "State" to "include[] the District of Columbia and Puerto Rico, except for the purpose of defining who may be a debtor under chapter 9 of this title," 11 U.S.C. § 101(52); and, therefore, (c) Section 903(1) expressly preempts any law of the Commonwealth that prescribes a method of composition of indebtedness that binds non-consenting creditors.  Op. & Order at 32-37.  That syllogism fundamentally misapprehends and misapplies both express and implied

preemption law, the meaning and history of Section 903, and the overarching goals of the Bankruptcy Code.

1. The District Court Misapprehended And Misapplied Express Preemption Law

The District Court ignored the law of preemption under which this case must be decided. "In all pre-emption cases . . . [courts must] start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the *clear and manifest* purpose of Congress." Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996) (emphasis added). "It follows that when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily accept the reading that disfavors pre-emption." CTS Corp. v. Waldburger, 134 S. Ct. 2175, 2189 (2014) (internal quotation marks omitted). That law applies no less to Puerto Rico than it does to any of the 50 States. Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp., 485 U.S. 495, 499 (1988); Op. & Order at 30 ("For preemption purposes, the laws of Puerto Rico are the functional equivalent of state laws.") (internal quotation marks omitted).

As this Court recently ruled, the presumption that a federal act does not preempt an otherwise valid Commonwealth law can be set aside only in the face of clear and contrary congressional intent:

> In determining the preemptive effect of a federal law, we must look to the intent of Congress. We begin with the presumption that a federal act does not preempt an otherwise valid state law, and we set aside that postulate only in the face of clear and contrary congressional intent. In some instances, that intent can appear haec verba on the face of a statute. In the absence of express language, however, we must look to the structure and purpose of the statute.

Antilles Cement Corp. v. Fortuño, 670 F.3d 310, 323 (1st Cir. 2012) (internal

citations omitted). That presumption applies with full force here. See, e.g.,

Highland Realty, Inc. v. Superior Court of Puerto Rico, 103 D.P.R. 306, 3 P.R.

Offic. Trans. 426, 430 (1975) ("[T]he existence of a federal bankruptcy act does

not annul the power of the states or of Puerto Rico of having their own legislation

in any aspect which is not in conflict with the federal statute.").

The District Court ignored these principles and the presumption against

preemption when it applied an express preemption analysis in this case. Indeed,

the District Court turned preemption analysis upside down when it ruled that

"[n]othing in the legislative history indicates that Congress intended *to exempt*

Puerto Rico from" Section 903(1). Op. & Order at 38 (emphasis added). Rather,

the court could properly find that Section 903(1) preempts the Recovery Act only

upon identifying "clear and contrary congressional intent" *to preclude* the

Commonwealth from acting as it did. Antilles Cement Corp. , 670 F.3d at 323-24.

2.   The District Court's Ruling Frustrates The Overarching Goal Of The Bankruptcy Code To Provide An Orderly And Fair Process For Creditors To Collect On Their Claims

While "state laws are preempted when they conflict with federal law," including "where compliance with both federal and state regulations is a physical impossibility, . . . [or] where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," Arizona v. United States, 132 S. Ct. 2492, 2501 (2012) (internal quotation marks and citation omitted), no such conflict is present here.  To the contrary, it is the District Court's misreading of the Bankruptcy Code that creates an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

Allowing the Recovery Act to stand would not create a situation in which it would be physically impossible to comply with both federal and state law.  The plain text of the Bankruptcy Code precludes the Commonwealth from providing for the adjustment of its municipalities' debt under Chapter 9 of the Bankruptcy Code.  Thus, providing for such adjustment under Commonwealth law creates no conflict with the Bankruptcy Code, given that the Commonwealth and its municipalities are expressly excluded from seeking relief under Chapter 9.

Further, interpreting the Bankruptcy Code to allow the Commonwealth to exercise this power is wholly consistent with the purposes and objectives of the Code.  In fact, it is the District Court's contrary reading that would create an

11

obstacle to the achievement of Congress's purposes and objectives because that reading fails to consider the Bankruptcy Code as a whole. Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 373 (2000) ("What is a sufficient obstacle is a matter of judgment, to be informed *by examining the federal statute as a whole* and identifying its purpose and intended effects . . . .") (emphasis added).

It has long been recognized that "one of the prime purposes of the bankruptcy law has been to bring about a ratable distribution among creditors of a bankrupt's assets." Young v. Higbee Co., 324 U.S. 204, 210 (1945); see also Kuehner v. Irving Trust Co., 299 U.S. 445, 451 (1937) ("[T]he object of bankruptcy laws is the equitable distribution of the debtor's assets amongst his creditors . . . ."); Straton v. New, 283 U.S. 318, 320-21 (1931) ("The purpose of the Bankruptcy Act (11 USCA) passed pursuant to the power of Congress to establish a uniform system of bankruptcy throughout the United States, is to place the property of the bankrupt, wherever found, under the control of the court, for equal distribution among the creditors."). In fact, the Supreme Court has specifically explained that the Bankruptcy Code seeks "to protect the creditors from one another." Higbee, 324 U.S. at 210.

More specifically, in adopting Chapter 9 and the federal municipal bankruptcy laws that preceded it, Congress was particularly cognizant of the harm that would ensue if municipalities did not have access to a reorganization remedy,

noting that "[f]or an embarrassed debtor without the remedy afforded by this bill, the only effective recourse is the repeal of its charter by the State legislature, *in which event creditors are generally left without any remedy.*"  H.R. Rep. No. 686, 94th Cong., 2d Sess. 4 (1976) (emphasis added).  The legislative history of the predecessor to Chapter 9 makes clear that the new law was intended to end the then-existing "legislative no-man's land."  S. Rep. No. 911, 75th Cong., 1st Sess. 3 (1937).  The purpose of Chapter 9 was to *create* a means by which a State could allow municipal debtors to restructure their debt in an orderly way.  The purpose, then, was the exact opposite of what the District Court's ruling effects, by barring the Commonwealth from either enacting its own legislation or taking advantage of Chapter 9.

In sum, the District Court's misreading of the Bankruptcy Code frustrates the achievement of the full purposes and objectives of the Bankruptcy Code, which are to provide a fair and orderly process where creditors can be paid.  The District Court's judgment would leave creditors of the Commonwealth's municipal corporations in the "legislative no-man's land" that Congress sought to eliminate, at the mercy of a race among creditors to the courthouse in a chaotic grab for the assets of public utilities that provide essential services to the Commonwealth's residents and businesses.

13

3.  The District Court Also Misapprehended And Misapplied Section 903

The District Court also misinterpreted Section 903.  It focused on the proviso to Section 903 to the exclusion of the Section's title and the remainder of its text.  And even then, the court misinterpreted the proviso.  When read properly, Section 903 does not even approach evincing the clear and contrary congressional intent that is necessary to invalidate the Recovery Act.

The first step in any statutory interpretation is to read the language of the statute as a whole.  See Utility Air Regulatory Grp. v. EPA, 134 S. Ct. 2427, 2442 (2014) ("[R]easonable statutory interpretation must account for both the specific context in which language is used and the broader context of the statute as a whole.") (internal quotation marks omitted); Gen. Dynamics Land Sys., Inc. v. Cline, 540 U.S. 581, 596 (2004) ("[S]tatutory language must be read in context [since] a phrase gathers meaning from the words around it.") (internal quotation marks omitted).  The court also must take guidance from the title of a statute.  See Yates v. United States, --- S. Ct. ---; No. 13-7451, slip op. at 10 (Feb. 25, 2015). Further, a statutory provision must be construed not "in isolation" but in connection with "the remainder of the statutory scheme." United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 371 (1988).

The District Court missed that first step.  It ignored the title to Section 903, which reads: "Reservation of State power to control municipalities."  The statute

14

thus reflects Congress's intent to preserve *State* power.  It does not reflect any intent to preempt the power of the Commonwealth to enact emergency legislation for public corporations – such as PREPA – which are not covered by Chapter 9, see 11 U.S.C. §101(52), and whose reorganization thus cannot conflict with any provisions of Chapter 9.

The District Court also ignored most of the text of Section 903.  Section 903, read as a whole, reflects an intent by Congress to *preserve* the powers of the States covered by Chapter 9 to exercise political and governmental powers, excepting solely the power of such States to prescribe a method of composition of indebtedness that would bind non-consenting creditors.  That intent is evidenced by the opening words of Section 903 itself: "This chapter does not limit or impair the power of a State to control, by legislation or otherwise, a municipality of or in such State in the exercise of the political or governmental powers of such municipality, including expenditures for such exercise . . . ."  11 U.S.C. § 903.  This "chapter" is Chapter 9 of the Bankruptcy Code, which authorizes relief for the 50 States, but not Puerto Rico.  There is nothing in Chapter 9 that could "limit or impair the power" of the Commonwealth.  The subject to which Congress addressed itself in Section 903 is the States addressed by Chapter 9, and not Puerto Rico, which is not covered by Chapter 9.

The Court also ignored that, in context, the language it deemed to preempt the Recovery Act is a proviso, or exception, to Section 903 and does not have independent force.  Section 903 uses the language of "qualification" – the term "but" – before Section 903(1) to indicate that the following subsections qualify the preceding text.  Cf. Barnhart v. Thomas, 540 U.S. 20, 26 (2003) (noting that a "limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows").  After the general rule, Section 903 states:

> but—
>
> (1) a State law prescribing a method of composition of indebtedness of such municipality may not bind any creditor that does not consent to such composition; and
>
> (2) a judgment entered under such a law may not bind a creditor that does not consent to such composition.

"The general office of a proviso is to except something from the enacting clause, or to qualify and restrain its generality and prevent misinterpretation." United States v. Morrow, 266 U.S. 531, 534 (1925).  "According to the ordinary rule, a proviso at the close of a section, or of an independent paragraph like that now before us, is to be construed as only limiting, or as being limited by, what precedes it therein." United States v. Walsh, 154 F. 770, 771 (1st Cir. 1907). Thus, Section 903(1) cannot properly be read as a general rule of preemption covering all municipalities, regardless of whether they are eligible to be debtors under Chapter 9.  Rather, it can only be read to cover *only* those entities that are the

subject of the enacting clause, that is, only the States that are covered by Chapter 9 and whose rights might otherwise (but for the language of Section 903) be limited by Chapter 9. Were it otherwise, the word "but" would have no meaning. See Hibbs v. Winn, 542 U.S. 88, 101 (2004) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.") (citation omitted).[3]

Finally, even if the proviso in Section 903(1) were considered in isolation, the District Court misread the proviso's words. Section 903(1) provides that "a State law prescribing a method of composition of indebtedness of such municipality may not bind any *creditor* that does not consent to such composition," and Section 903(2) provides that "a judgment entered under such a law may not bind a *creditor* that does not consent to such composition" (emphasis added). The critical word in each proviso is "creditor." If a law does not purport to bind a "creditor," Sections 903(1) and (2) are not implicated. But the word "creditor" has a defined meaning under the Bankruptcy Code. See 11 U.S.C. § 101 ("In this title, the following definitions shall apply . . . (10) the term 'creditor' means—"); Stenberg v. Carhart, 530 U.S. 914, 942 (2000) ("When a statute includes an explicit definition, we must follow that definition, even if it varies from that term's

---

[3] This interpretation of Section 903 is supported by relevant commentary. See Thomas Moers Mayer, State Sovereignty, State Bankruptcy, and a Reconsideration of Chapter 9, 85 AM. BANKR. L.J. 363, 379 & n.84 (Fall 2011) (describing Section 903(1) "as an exception to § 903's respect for state law in Chapter 9 and *thus appears to apply only in a Chapter 9 bankruptcy*") (emphasis added).

ordinary meaning.").  "Creditor" means an "entity that has a claim *against the debtor*."  11 U.S.C. § 101(10) (emphasis added).  And "debtor" also has a defined meaning.  For purposes of Chapter 9, it does *not* include the Commonwealth or any of its instrumentalities.  Thus, under Section 903, PREPA is not a "debtor," the bondholders of PREPA are not "creditors," and – by its own terms – the proviso to Section 903 is not applicable *even if that language were read in isolation*.

The District Court misread the proviso to include all "creditors" under the Black's Law Dictionary definition regardless of the Code's definition because the Code also defines creditor to include (B) "an entity that has a claim against the estate," or (C) "an entity that has a community claim," thus finding that the term "creditor" is not "limited to entities eligible to bring claims pursuant to Chapter 9." Op. & Order at 41.  But all of these alternate definitions of "creditor" are limited to those who can bring claims on behalf of an estate created under Section 541 of the Bankruptcy Code.  The District Court truncated definition (B) of "creditor."  The full clause reads: "The term 'creditor means . . . entity that has a claim against the *estate of a kind specified in section 348(d), 502(f), 502(g), 502(h) or 502(i) of this title*."  11 U.S.C. § 101(10)(B) (emphasis added); <u>see also id.</u> § 541 (creating a statutory estate).  That added language makes definition (B) irrelevant to Puerto Rico municipalities; under no circumstances could such a municipality have a "creditor" as that term is defined in Section 101(B).  The same is true for Section

101(C): a Puerto Rico municipality could never have a creditor that is an "entity that has a community claim."  A Puerto Rico municipality could conceivably have a "creditor" only under definition (A) – but, as shown above, a Puerto Rico municipality could never have such a "creditor" because no Puerto Rico municipality is eligible to be a debtor under any chapter of the Bankruptcy Code, and thus the District Court's reading fails.

4.  The District Court's Interpretation Is Inconsistent With The Purpose Of Section 903 And Its Legislative History

The District Court also misread the purpose of Section 903.  It held that Congress passed the statute because "'a bankruptcy law under which bondholders of a municipality are required to surrender or cancel their obligations should be uniform throughout the 48 States,'" Op. & Order at 37 (quoting H.R. Rep. No. 79-2246, at 4 (1946)), and that permission for the States to enact their own versions of Chapter 9 "'would frustrate the constitutional mandate of uniform bankruptcy laws,'" id. at 38 (quoting S. Rep. No. 95-989, at 110 (1978)).  The District Court then leaped from that premise to the unjustified conclusion that "Congress's decision not to permit Puerto Rico municipalities to be Chapter 9 debtors . . . reflects its considered judgment to retain control over any restructuring of municipal debt in Puerto Rico."  Id. at 39.  In fact, there is no evidence that Congress made such a "considered judgment" to bar Puerto Rico from authorizing its public corporations to restructure their debts under local law.  Moreover, the

19

District Court inverted proper preemption analysis by focusing on whether "Congress intended *to exempt* Puerto Rico" from Section 903(1), <u>id.</u> at 38 (emphasis added), rather than on whether Congress intended *to preclude* Puerto Rico from exercising this power.  The District Court identified no actual evidence of a preclusive intent, and in fact there is none.

As the court implicitly recognized, Section 903(1) satisfies the mandate of uniform bankruptcy laws as applied to the 50 States because each of the 50 States can authorize its municipalities to file under Chapter 9.  The provision thus reflects an intent not to permit the 50 States, which can take advantage of Chapter 9, from enacting a competing version of Chapter 9.  The goal of uniformity is served by requiring eligible States to participate in Chapter 9.

The court was entirely mistaken, however, in its statement that "Puerto Rico municipalities are not unique in their inability to restructure their debts . . . because Chapter 9 is available to a municipality only if it receives specific authorization from its state, and many states have not enacted authorizing legislation."  <u>Id.</u> at 39.  The court made that observation in support of its conclusion that precluding the Commonwealth from enacting laws modeled after Chapter 9 was consistent with uniformity.  But the States that have not yet permitted their municipalities to file under Chapter 9 are free to do so.  They can opt into Chapter 9 at any time.  Under the District Court's holding, the Commonwealth (and perhaps the District of

Columbia) are alone in possessing *neither* the power to authorize their municipalities to reorganize under Chapter 9 *nor* the power to reorganize under any similar statute. That interpretation disserves the interest of uniformity and assumes that Congress intended to pass a law that enshrined non-uniformity; it certainly does not promote uniformity.

Indeed, the only legislative history of Chapter 9 and of Section 903 demonstrates that it was Congress's intent to make available to the States a means of permitting their municipalities and instrumentalities to reorganize, while ensuring that those States that can participate in Chapter 9 do not enact alternative statutes. It reflects no intent to deprive the Commonwealth, which is not able to participate in Chapter 9, of the ability to enact its own legislation to achieve what federal law permits every other state to enjoy. To the contrary, as noted above, when Congress adopted Chapter 9 and the federal municipal bankruptcy laws that preceded it, it warned of the harm that would ensue if municipalities did not have access to a reorganization remedy, noting that "[f]or an embarrassed debtor without the remedy afforded by this bill, the only effective recourse is the repeal of its charter by the State legislature, in which event creditors are generally left without any remedy." H.R. Rep. No. 686, 94th Cong., 2d Sess. 4 (1976). Congress stated that Chapter 9 would provide a forum where "distressed cities, counties, and minor political subdivisions, . . . of their own volition, free from all

21

coercion, may meet with their creditors under the necessary judicial control and assistance in an effort to effect an adjustment of their financial matters upon a plan deemed mutually advantageous." Id.

The original municipal bankruptcy laws were enacted in response to a municipal default crisis during the Depression. The legislative history of the predecessor to Chapter 9 made clear that the new law was intended to end the then-existing "legislative no-man's land." S. Rep. No. 911, 75th Cong., 1st Sess. 3 (1937). In other words, the purpose of Chapter 9 was to *create* a means by which a State could allow municipal debtors to restructure their debt in an orderly and fair way, not to limit the Commonwealth, which is not eligible for Chapter 9, from enacting its own legislation to serve the same salutary purposes.

The portion of Section 903 that protects States' authority – providing that "[t]his chapter," Chapter 9, "does not limit or impair" a State's right to govern its municipalities – first appeared as Section 83(i) of the Municipal Bankruptcy Act of 1937 with the intention of drawing a line, consistent with constitutional limits, as to how far Chapter 9 could reach in interfering with States' relationships with their municipalities, after the original Municipal Bankruptcy Act of 1934 was struck down as an unconstitutional infringement of States' rights. It was intended to preserve State rights – as the title itself reflected.

The limited purpose of the provisos contained in Section 903(1) and (2) is to ensure that, after the Supreme Court's decision in <u>Faitoute Iron & Steel Co. v. Asbury Park</u>, 316 U.S. 502 (1942), the sovereign authority reserved to the States by the first clause of Section 903 (<u>i.e.</u>, to the States covered by Chapter 9) did not permit those States to create regimes for municipal compositions that conflict with the federal regime enacted as Chapter 9.  At the time, Commonwealth municipalities were considered eligible debtors under what became Chapter 9, and there was no intent or need to treat them differently from any of the States – because the Commonwealth, like the States, could enable its municipalities to file under Chapter 9, the Commonwealth was statutorily disabled from creating a competitor to Chapter 9.

Indeed, the language that the District Court relied upon as barring Puerto Rico from addressing the needs of its citizens comes not from Section 903 itself, or even Chapter 9, but from Section 101(52), which was added to the Bankruptcy Code at a different time among miscellaneous amendments made in 1984.  At the time, the Commonwealth did not need to be included as a State that could empower its municipalities to participate under Chapter 9 because, after the repeal of the Jones Act in 1952, there was no federal law that was construed to limit the power of Puerto Rico to pass its own laws permitting its public corporations to adjust debts.  Section 101(52) thus does not address preemption at all, but merely

reflects Congress's intent that Puerto Rico would be considered to be a State under the Bankruptcy Code except for the purpose of defining who may be a debtor under Chapter 9.  See H. R. Rep. No. 96-1195 at 8 (1980) (explaining that the "amendment adds a . . . definition for 'State' primarily to assure that residents and domiciliaries of Puerto Rico can become debtors under title 11").  With respect to Puerto Rico's municipalities, it reflects, for example, Congress's intent to provide them the same privileges and benefits as the municipalities of any of the 50 States, save for the ability to file as a debtor under Chapter 9.  See 11 U.S.C. § 101(52).[4] But there is nothing in either the language of Section 101(52) or in its legislative history that would suggest that a statute that was intended not to extend to the Commonwealth a federal procedure it did not need was, at the same time, intended to deprive the Commonwealth of a pre-existing power it already enjoyed.

Thus, to the extent that one can impute meaning to Congress's decision in 1984 to define "State" to include "Puerto Rico, except for the purpose of defining who may be a debtor under Chapter 9 of this title," 11 U.S.C. § 101(52), it was not

---

[4] Thus, by defining "State" to include the Commonwealth, Congress made clear that municipalities of the Commonwealth – no less than municipalities of the 50 States – are entitled under Section 364(b)(4) to exercise police and regulatory powers against debtors in bankruptcy notwithstanding an automatic stay, are entitled to a minimum time period to file claims under Section 502, and enjoy a priority of distribution under Section 507(a)(8) and an exception to the discharge under Section 523(a)(7).  It is inconceivable that the language conferring those benefits on Puerto Rico municipalities was intended, at the same time, to deprive the Commonwealth of a pre-existing power that it enjoyed to pass municipal debt restructuring laws, and to disadvantage its municipalities and public corporations relative to every other public corporation and municipality – rather than to leave to the Commonwealth the authority to enact its own municipal debt restructuring laws, pursuant to its pre-existing power.

to withdraw *sub silentio* the Commonwealth's pre-existing power to enact laws permitting its public corporations to adjust their debts. It is implausible – and completely inconsistent with the legislative history – that the law also was intended to withdraw Puerto Rico's pre-existing power to pass such laws.

The District Court held that "[n]othing in the legislative history indicates that Congress intended *to exempt* Puerto Rico from Section 903(1)'s expressly universal preemption purview." Op. & Order at 38 (emphasis added). But that analytic approach to the legislative history inverts this Court's teaching that, when faced with a preemption claim, courts must "presum[e] that a federal act does not preempt an otherwise valid state law" and can "set aside that postulate only in the face of clear and contrary congressional intent." Antilles Cement Corp., 670 F.3d at 323. The District Court was obligated to consider whether there was "clear and contrary congressional intent" to *preclude* the Commonwealth from enacting legislation authorizing its public corporations to adjust their debts. The Court identified no actual evidence of any such intent, and there is none.

## CONCLUSION

For the foregoing reasons, this Court should reverse the District Court's grant of summary judgment to Plaintiffs-Appellees and vacate the injunction barring enforcement of the Recovery Act.

Dated:  March 16, 2015                    RESPECTFULLY SUBMITTED,


s/ Jorge R. Roig
**JORGE R. ROIG** (76786)
e-mail: jroig@gonzalezroig.com

s/ Joanne A. Tomasini-Muñiz
**JOANNE A. TOMASINI-MUÑIZ** (76781)
e-mail: jtomasini@gonzalezroig.com

**GONZÁLEZ, MACHADO & ROIG, LLC**
PO Box 193077
San Juan, Puerto Rico 00919-3077
Tel.: (787) 773-6363
Fax: (888) 450-9876

s/ Lawrence B. Friedman
**LAWRENCE B. FRIEDMAN** (1143082)
**RICHARD J. COOPER** (1168943)
**LEWIS J. LIMAN** (1168942)
**SEAN A. O'NEAL** (1168944)
**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
One Liberty Plaza
New York, New York 10006
Tel.: (212) 225-2000
Fax: (212) 225-3999

***Attorneys for the Puerto Rico Electric Power Authority***

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) and Local Rule 29 because this brief contains 6,444 words, excluding

the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  This brief

complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type

style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared

in a proportionally spaced typeface using Microsoft Word version 2010 in fourteen

point, Times New Roman font.

<div style="margin-left: 4em">

s/ Jorge R. Roig
**JORGE R. ROIG** (76786)
e-mail: jroig@gonzalezroig.com

**GONZÁLEZ, MACHADO & ROIG, LLC**
PO Box 193077
San Juan, Puerto Rico 00919-3077
Tel.: (787) 773-6363
Fax: (888) 450-9876

***Attorneys for the Puerto Rico Electric Power Authority***

Dated: March 16, 2015

</div>

27

## CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2015, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system.  I certify that all parties and *amici* or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system, including the following: Manuel Fernández-Bared, Jonathan Mark Wagner, Theodore B. Olson, Christopher Landau, Joanne Alexandra Tomasini-Muñiz, Matthew D. McGill, Janitza M. García-Marrero, David C. Indiano-Vicic, Leticia Casalduc-Rabell, Lawrence B. Friedman, Margarita Luisa Mercado-Echegaray, Joseph Gabriel Feldstein-Del Valle, Linette Figueroa-Torres, Zarel Joan Soto-Acaba, Scott Grant Stewart, Claire McCusker Murray, Lewis Jeffrey Liman, Richard James Cooper, Sean Aaron O'Neal, Matthew J. Williams, David Ellis Blabey, Jr., Andrea G. Miller, Philip Bentley, John E. Roberts, Mark David Harris, Gabriel R. Avilés-Aponte, and Edilberto Berríos Pérez.

s/ Jorge R. Roig
**JORGE R. ROIG** (76786)
e-mail: jroig@gonzalezroig.com

**GONZÁLEZ, MACHADO & ROIG, LLC**
PO Box 193077
San Juan, Puerto Rico 00919-3077
Tel.: (787) 773-6363
Fax: (888) 450-9876

*Attorneys for the Puerto Rico Electric Power Authority*

Dated: March 16, 2015