Cases No. 15-1218, 15-1221, 15-1271 & 15-1272

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

---

FRANKLIN CALIFORNIA TAX-FREE TRUST, *ET AL.*,

*Plaintiffs-Appellees*,

v.

THE COMMONWEALTH OF PUERTO RICO, *ET AL.*,

*Defendants-Appellants*.

---

BLUEMOUNTAIN CAPITAL MANAGEMENT, LLC, *ET AL.*,

*Plaintiffs-Appellees*,

v.

ALEJANDRO GARCIA-PADILLA, IN HIS OFFICIAL CAPACITY AS
GOVERNOR OF THE COMMONWEALTH OF PUERTO RICO, *ET AL.*,

*Defendants-Appellants*

---

On Appeal from the United States District Court
for the District of Puerto Rico
Case Nos. 3:14-cv-1518 & 3:14-cv-1569

---

## BRIEF OF THE CHAMBER OF COMMERCE OF
## THE UNITED STATES OF AMERICA AS *AMICUS CURIAE*
## IN SUPPORT OF PLAINTIFFS-APPELLEES

---

Kate Comerford Todd
Steven P. Lehotsky
U.S. CHAMBER LITIGATION CENTER, INC.
1615 H St., NW
Washington, DC 20062

William S. Consovoy
Thomas R. McCarthy
J. Michael Connolly
CONSOVOY MCCARTHY PLLC
3033 Wilson Blvd., Suite 700
Arlington, VA 22201
Tel: (703) 243-9423

Dated: April 15, 2015

*Counsel for Amicus Curiae*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rules of Appellate Procedure 29 and 26.1(a), *amicus curiae* the Chamber of Commerce of the United States of America states that it is not a subsidiary of any corporation, and no publicly held corporation owns 10% or more of its stock.

# **TABLE OF CONTENTS**

Page

CORPORATE DISCLOSURE STATEMENT ........................................................ ii

TABLE OF AUTHORITIES ................................................................................. iv

STATEMENT OF IDENTITY AND INTEREST OF *AMICUS CURIAE* .............. 1

STATEMENT REGARDING AUTHORSHIP OF *AMICUS CURIAE* BRIEF ....... 2

SUMMARY OF THE ARGUMENT ...................................................................... 2

ARGUMENT .......................................................................................................... 6

I.   Section 903(1) Of The Bankruptcy Code Expressly Preempts Municipal
     Bankruptcy Laws Such As The Recovery Act. .................................................. 7

II.  Upholding Laws Such As The Recovery Act Could Jeopardize The Federal
     Interest In Bankruptcy Uniformity And Signficiantly Disrupt The National
     Economy .......................................................................................................... 15

CONCLUSION ...................................................................................................... 24

CERTIFICATE OF COMPLIANCE ..................................................................... 26

CERTIFICATE OF SERVICE .............................................................................. 27

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## CASES

*Barnhart v. Sigmon Coal Co.*, 534 U.S. 438 (2002) ................................. 12

*Cent. Virginia Cmty. Coll. v. Katz*, 546 U.S. 356 (2006) ....................... 15

*Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742 (10th Cir. 2010) ....... 8

*City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113 (2005) ............................. 11

*Davila-Perez v. Lockheed Martin Corp.*, 202 F.3d 464 (1st Cir. 2000) ................. 12

*In re Fahey*, 779 F.3d 1 (1st Cir. 2015) ................................................ 13

*In re Goerg*, 844 F.2d 1562 (11th Cir. 1988) ............................................ 7

*In re Hood*, 319 F.3d 755 (6th Cir. 2003) ............................................... 17

*In re Jordan*, 13 F. Cas. 1079 (W.D.N.C. 1873) ...................................... 16

*In re Marrama*, 430 F.3d 474 (1st Cir. 2005) .......................................... 14

*In re Weinstein*, 164 F.3d 677 (1st Cir. 1999) ......................................... 7

*In re Westmoreland Coal Co.*, 213 B.R. 1, 6 (Bankr. D. Colo. 1997) ................... 23

*Int'l Shoe Co. v. Pinkus*, 278 U.S. 261 (1929) ......................................... 8

*Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555 (1935) ...................... 7

*Massachusetts Delivery Ass'n v. Coakley*, 769 F.3d 11 (1st Cir. 2014) ................. 8

*N.Y. Trust Co. v. Commissioner*, 68 F.2d 19 (2d Cir. 1933) (L. Hand, J.) ............. 10

*New Progressive Party (Partido Nuevo Progresista) v. Hernandez Colon*,
779 F. Supp. 646 (D.P.R. 1991) ................................................... 12

*Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193 (2009) .................... 11

*Ry. Labor Executives' Ass'n v. Gibbons*, 455 U.S. 457 (1982) ...................... 16, 18

iv

*Schultz v. United States*, 529 F.3d 343 (6th Cir. 2008) ............................................ 7

*United States v. Gelin*, 712 F.3d 612 (1st Cir. 2013) ............................................ 14

*United States v. Locke*, 529 U.S. 89 (2000) ......................................................... 7

*Utah Junk Co. v. Porter*, 328 U.S. 39 (1946) ....................................................... 10

*Whyte v. Barclays Bank PLC*, 494 B.R. 196 (S.D.N.Y. 2013) ................................ 8

## STATUTES

11 U.S.C. § 109 ................................................................................................ 10

11 U.S.C. § 101(52) .......................................................................................... 18

11 U.S.C. § 101(55) .......................................................................................... 19

11 U.S.C. § 903(1) .......................................................................................... 2, 9

## OTHER AUTHORITIES

2 Joseph Story, Commentaries on the Constitution of the United States
    § 1107 (2d ed. 1851) ................................................................ 17, 19, 20

Communication From the Executive Director, Commission on the
    Bankruptcy Laws of the United States Transmitting a Report of the
    Commission on the Bankruptcy Laws of the United States, July 1973,
    H.R. Doc. No. 137, Parts I, 93d Cong., 1st Sess. (1973) .................................. 23

Edward Everett, *Accumulation, Property, Capital, and Credit,* 1 Hunt's
    Merchants' Mag. 21 (1839) ................................................................ 21

Jesse Hamilton and Cheyenne Hopkins, *Regulator Fight Over Munis Threatens
    New School for Your Kid*, Bloomberg Business (Mar. 18, 2015) ...................... 22

Judith Schenck Koffler, *The Bankruptcy Clause and Exemption Laws:
    A Reexamination of the Doctrine of Geographic Uniformity*,
    58 N.Y.U. L. Rev. 22 (1983) ................................................................ 17

National Association of Bond Lawyers, *Tax Exempt Bonds: Their Importance
    to the National Economy and to State and Local Governments*, White Paper
    (Sept. 2012) ................................................................................................ 21

*Reading Law: The Interpretation of Legal Texts*, Antonin Scalia & Bryan A. Garner (1st ed. 2012) ........................................................................... 10

Richard C. Sauer, *Bankruptcy Law and the Maturing of American Capitalism*, 55 Ohio St. L.J. 291 (1994) ..................................................... 21, 23

S. Rep. 95-989 (1978) ...................................................................................... 13

The Federalist No. 32 (A. Hamilton) (George W. Carey & James McClellan eds., 2001) ................................................................................. 17

The Federalist No. 42 (J. Madison) (Clinton Rossiter ed., 1961) ............................. 7

## CONSTITUTIONAL PROVISIONS

U.S. Const. Art. I, § 8, cl. 4 .......................................................................... 6

## STATEMENT OF IDENTITY AND INTEREST OF *AMICUS CURIAE*

In accordance with Federal Rule of Appellate Procedure 29, the Chamber of Commerce of the United States of America ("the Chamber") submits this brief *amicus curiae* with the consent of all parties. The Chamber is the world's largest business federation. It represents 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts, including this Court. To that end, the Chamber regularly files *amicus curiae* briefs in cases that raise issues of concern to the nation's business community.

The Chamber has a strong interest in the proper resolution of this case. Many of the Chamber's members are active in the nationwide municipal bond market and many more depend on the public works this market funds. Further, the Chamber's members depend on a stable, predictable, and nationally uniform bankruptcy system. These important interests would be jeopardized if Puerto Rico, the District of Columbia, and other territories are allowed to enact their own municipal bankruptcy regimes. And, the uniformity the Constitution envisions and Congress has implemented through the Bankruptcy Code would be destroyed if, as

Appellants argue, all States have the freedom to establish their own municipal bankruptcy regimes.

## STATEMENT REGARDING AUTHORSHIP OF *AMICUS CURIAE* BRIEF

Pursuant to Federal Rule of Appellate Procedure 29(c), *amicus curiae* states that no counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than *amicus curiae*, their members, or their counsel made a monetary contribution to its preparation or submission.

## SUMMARY OF THE ARGUMENT

To call Puerto Rico's Debt Enforcement and Recovery Act ("Recovery Act") novel legislation would be an understatement. The Recovery Act was passed in order to provide special protection to Puerto Rico's financially troubled public utilities. But not only is this rogue bankruptcy system available only to Puerto Rico's public utilities, such as the Puerto Rico Electric Power Authority ("PREPA"), it creates a special local court for resolution of their debts, and it deprives their mostly out-of-state creditors of the structural protections afforded to them under federal law. In all material respects, the Recovery Act is nothing more than a private bill passed for the benefit of specific set of insolvent entities: Puerto Rico public instrumentalities.

The problem for Puerto Rico is that Section 903(1) of the Bankruptcy Code provides "that a State law prescribing a method of composition of indebtedness of such municipality may not bind any creditor that does not consent to such composition." 11 U.S.C. § 903(1). Puerto Rico is a "State" as the Bankruptcy Code defines that term, the Recovery Act is a "law," and it binds creditors of Puerto Rico public utilities without their consent. It is difficult to conceive of a law that could more squarely conflict with Section 903(1).

Appellants' principal response is that Section 903(1) is inapplicable because PREPA is not a "debtor" as the Bankruptcy Act defines that term and, therefore, BlueMountain Capital and Franklin California are not "creditors." If Appellants are correct, however, every State could follow Puerto Rico's lead, ignore Chapter 9, and create its own municipal bankruptcy system. After all, the State would merely need to deny its municipalities authority to file a Chapter 9 petition, thus placing its entities beyond Appellants' version of what it means to be a debtor, in order to liberate itself from Section 903(1)'s preemptive sweep. Even if that did not happen, under Appellant's construction it would become effectively impossible for *any* municipality to file under Chapter 9 as it would have no "creditors" to contact before initiating its case (a general prerequisite to filing a bankruptcy petition). And that cannot be right. The Bankruptcy Code's structure, context, and purpose presents a classic circumstance, given the difficult Contracts Clause issue that will

be raised on remand if Appellants prevail, in which courts should apply the ordinary meaning of a term instead of mechanically applying the statutory definition.

Appellants' other statutory arguments fare no better. Notwithstanding their attempt to skew the statutory analysis, the presumption against preemption is not applicable here. The creation of a municipal bankruptcy system for public utilities is not an exercise of Puerto Rico's police power and, in any event, bankruptcy is an area with a longstanding federal presence. Nor is it incongruent and unfair, as Appellants argue, to treat Puerto Rico like a State when the Bankruptcy Code does not allow the Commonwealth to authorize its instrumentalities to file for Chapter 9 relief. On this score, Appellants' argument is with Congress, not the district court. That Congress made that policy choice itself instead of delegating it to Puerto Rico is not a justification for rewriting Section 903(1) to meet the Commonwealth's desired outcome. Finally, Appellants' challenge to the district court's reliance on legislative history similarly falls short. The legislative history shows that Section 903(1) advances Congress's interest in uniformity.

Indeed, it was that interest that motivated the Framers to vest Congress with the bankruptcy power in the first place. The lack of bankruptcy uniformity was one of the Articles of Confederation's principal flaws. There was broad agreement that the wide variation in bankruptcy rules, and the parochial squabbling this patchwork

regime allowed to flourish, inhibited interstate commerce and thus the formation of a truly national economy. The proposition that the Constitution should empower Congress to establish a uniform bankruptcy system that ensured that creditors from distant jurisdictions would be treated equitably when investments soured drew almost no opposition.

Yet Appellants propose an interpretation of Section 903(1) that would, at a bare minimum, reintroduce non-uniform municipal bankruptcy to Puerto Rico, the District of Columbia, and other territories. That alone would be a serious problem. In reality, though, Appellants' argument cannot even be confined to the territories. Their novel construction of Section 903(1) would allow *all* States (not just Puerto Rico, the District of Columbia, and other non-States) to circumvent Chapter 9 by denying their municipalities authority to seek relief through federal bankruptcy. The Recovery Act's special protection for Puerto Rican municipalities at the expense of its creditors will serve as a model for every other State to follow. The short-term gain a State secures by following Puerto Rico's lead is obvious. The fact that creditors haling from California, for instance, are having their contracts overridden by Puerto Rico will only provide States additional incentive to return the favor. State laws like the Recovery Act thus threaten to restore the State-to-State jousting that the Bankruptcy Code was supposed to end.

5

The result will be a municipal bond market with reduced access to the low-cost capital the investor class has always supplied. Credit markets, including this one, depend on a stable and predictable bankruptcy system. Chapter 9 provides that certainty with respect to municipal bankruptcies. Creditors thus invest on the understanding that, one, state law (or federal law for Puerto Rico, the District of Columbia, and other territories) will dictate whether a given municipality may file for bankruptcy and, two, that any such petition will be filed under Chapter 9 unless creditors consent to an alternative process. Investors will hesitate before participating in a system that allows Puerto Rico to changes the rules *ex post*. If they do invest, the financial terms will account for this new risk.

The economy will suffer in the end. Municipal bonds fund infrastructure projects that keep the backbone of our economy in good condition. Safe roads, bridges, and airports, good schools, and well-equipped public safety departments create the conditions that spur economic growth. If private investment becomes scarcer, more expensive, or quite likely both, municipalities will have to delay or cancel many of these important projects. The Nation's long-term economic interests should not be jeopardized so Puerto Rico (and many other States if Appellants prevail) may reap short-term political gain. The Framers were right to demand a uniform bankruptcy system, and Congress was right to use its plenary

authority to implement that vision through laws like Section 903(1). The decision below should be affirmed.

## ARGUMENT

### I.    Section 903(1) Of The Bankruptcy Act Expressly Preempts Municipal Bankruptcy Laws Such As The Recovery Act.

The Constitution provides that "The Congress shall have Power To … establish … uniform Laws on the subject of Bankruptcies throughout the United States …." U.S. Const. Art. I, § 8, cl. 4. The Framers understood that a national bankruptcy system was essential to a functioning economy. "The power of establishing uniform laws of bankruptcy is so intimately connected with the regulation of commerce, and will prevent so many frauds where the parties or their property may lie or be removed into different States, that the expediency of it seems not likely to be drawn into question." The Federalist No. 42, at 239 (J. Madison) (Clinton Rossiter ed., 1961); *see also Schultz v. United States*, 529 F.3d 343, 355 n.5 (6th Cir. 2008) (federal "bankruptcy laws were necessary to protect creditors in a national economy"). A federal bankruptcy system was further required by the fact that the Contracts Clause restricts a State's ability to discharge a debtor's financial obligations. "[U]nlike the states," Congress "is not prohibited from impairing the obligations of contracts." *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 589 (1935) (citations omitted). Put simply, "Congress has

plenary power to enact uniform federal bankruptcy laws." *In re Weinstein*, 164 F.3d 677, 682 (1st Cir. 1999) (citations omitted).

"Whether Congress has actually exercised its bankruptcy power in a particular area is, of course, a matter of statutory construction." *In re Goerg*, 844 F.2d 1562, 1565 (11th Cir. 1988). Appellants and PREPA argue that the Court must interpret the applicable provision of the Bankruptcy Code—Section 903(1)—in light of the presumption against preemption. But that is incorrect. "No artificial presumption" interferes with the Court's task of "determining whether Congress has displaced" the Recovery Act. *United States v. Locke*, 529 U.S. 89, 108 (2000). This is not a case where the Bankruptcy Code is collaterally interfering with state-created property rights or the enforcement of consumer protection laws, for example. The issue here involves Puerto Rico's entry into the field of bankruptcy itself, "an area where there has been a history of significant federal presence." *Id*.; *see also Whyte v. Barclays Bank PLC*, 494 B.R. 196, 200 n.6 (S.D.N.Y. 2013) ("Because there is a history of significant federal presence in this area of regulation, the Court does not apply a presumption against preemption."). When it comes to a State's enactment of its own municipal bankruptcy regime, then, Congress's creation of a uniform national system did not interfere with "Puerto Rico's police power." Brief of Government Development Bank ("GDB Br.") at 8. From the outset, the States have been "without power to make or enforce any law

governing bankruptcies that impairs the obligation of contracts or extends to persons or property outside its jurisdiction or conflicts with the national bankruptcy laws." *Int'l Shoe Co. v. Pinkus*, 278 U.S. 261, 263-64 (1929) (citations omitted).

The Court therefore applies "ordinary principles of statutory interpretation, looking initially to the plain language of the federal statute." *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 765 (10th Cir. 2010) (citing *Sprietsma v. Mercury Marine,* 537 U.S. 51, 62-63 (2002)); *see Massachusetts Delivery Ass'n v. Coakley*, 769 F.3d 11, 17 (1st Cir. 2014) (the Court must "'focus first on the statutory language, which necessarily contains the best evidence of Congress' pre-emptive intent.'") (quoting *Dan's City Used Cars, Inc. v. Pelkey*, 133 S. Ct. 1769, 1778 (2013) (other citation and quotations omitted)). That inquiry is straightforward here.

Under Section 903(1), "a State law prescribing a method of composition of indebtedness of such municipality may not bind any creditor that does not consent to such composition[.]" 11 U.S.C. § 903(1). The Recovery Act is "a State law" because 'State'" is defined to include "the District of Columbia and Puerto Rico, except for the purpose of defining who may be a debtor under chapter 9 of this title," *id.* § 101(52), and Section 903(1) "says nothing of who may be a Chapter 9 debtor," Addendum to GDB Br. ("Add") at 32-33. The Recovery Act prescribes a method of composition of indebtedness as "both Chapters 2 and 3 … create

9

procedures for indebted public corporations to adjust or discharge their obligations to creditors." Add. 35. PREPA is a municipality as the Bankruptcy Code defines that term. 11 U.S.C. § 101(40). And, last, the Recovery Act attempts to diminish creditors' rights without their consent. Add. 35-37. Hence, this is not a complicated statutory question: Section 903(1) expressly preempts the Recovery Act.

Appellants counter that the district court's interpretation fails at the outset because Section 903(1) only protects the rights of "creditors." According to this argument, Appellees are not "creditors," as the Bankruptcy Code defines that term, because PREPA is not a Chapter 9 "debtor" and there can be no "creditor" without a "debtor." Brief of Commonwealth of Puerto Rico ("Comm. Br.") 27-29; GDB Br. 22-27. That interpretation would render Section 903(1) meaningless at best and nonsensical at worst. Under that view, *any* State could circumvent Chapter 9 and create its own municipal bankruptcy system simply by denying to its entities the authority to file for federal bankruptcy. As Appellants urge the Court to hold here, the municipality would not be a "debtor" and its investors would not be "creditors." Worse still, this interpretation would have a ripple effect that would cause Chapter 9 to collapse on itself as it would block all municipalities from filing bankruptcy petitions. The Bankruptcy Code generally requires the insolvent municipality to reach out to its creditors before filing a Chapter 9 petition. *See* 11 U.S.C. § 109. Under Appellants' interpretation of the law, however, the

municipality would have no creditors to contact because there would be no "debtor" until the Chapter 9 case had "been commenced." *Id*. § 101(13).

No principle of interpretation commands the Court to adopt a self-defeating interpretation of the Bankruptcy Code. "Strict constructionism understood as a judicial straightjacket is a long-outmoded approach deriving from a mistrust of all enacted law." *Reading Law: The Interpretation of Legal Texts*, Antonin Scalia & Bryan A. Garner 355 (1st ed. 2012). That is because "a sterile literalism … loses sight of the forest for the trees." *N.Y. Trust Co. v. Commissioner*, 68 F.2d 19, 20 (2d Cir. 1933) (L. Hand, J.); *see also Utah Junk Co. v. Porter*, 328 U.S. 39, 44 (1946) ("Literalness may strangle meaning."). "[C]ontext, not just literal text, will often lead a court to Congress' intent in respect to a particular statute." *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 115 (2005). That is especially true where, as here, mechanically interpreting the statute would force the Court to confront a difficult constitutional question. *See, e.g.*, *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 206 (2009). Employing the ordinary meaning of "creditor" will ensure the Bankruptcy Code is interpreted sensibly and will allow the Court to avoid addressing a thorny Contracts Clause question that would need to be resolved on remand if Appellants' statutory construction argument prevails.

Appellants claim "[i]t would be anomalous, to say the least, to suppose that Congress intended for the limitation in Section 903(1) to apply to Puerto Rico,

which—unlike a State—does not have the option of authorizing its municipalities to restructure their debts under Chapter 9." Comm. Br. 31; GDB Br. 32-33. But that assertion misapprehends what happened here. Under Section 903, each State controls whether its municipalities will have access to Chapter 9 relief; many States allow their municipalities to be a Chapter 9 debtor, but many do not. The only difference is that, with respect to Puerto Rico, the District of Columbia, and other territories, Congress retained that authority and made the decision itself to deny to municipalities access to Chapter 9.

That should not come as a surprise in light of Congress's special relationship with these jurisdictions. *See, e.g.*, *Davila-Perez v. Lockheed Martin Corp.*, 202 F.3d 464, 468 (1st Cir. 2000) (explaining that Puerto Rico remains "subject to the plenary powers of Congress under the territorial clause"); *New Progressive Party (Partido Nuevo Progresista) v. Hernandez Colon*, 779 F. Supp. 646, 661 (D.P.R. 1991) ("The constitutional ramifications which flow from Puerto Rico's being an unincorporated territory are that Congress has plenary authority when legislating for Puerto Rico to treat Puerto Rico as equal to a state or to discriminate in favor or against Puerto Rico."). As the decision of many States to take the same action reflects, it also is an entirely reasonable policy choice. Appellants are free, of course, to disagree with the congressional policy, and if the Commonwealth and those with an aligned financial interest feel strongly enough, they can push

Congress to amend the Bankruptcy Code. But "[t]hese are battles that should be fought among the political branches and the industry. Those parties should not seek to amend the statute by appeal to the Judicial Branch." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 462 (2002).

Finally, Appellants and PREPA challenge the way in which the district court incorporated its examination of the legislative history into the statutory analysis. But their challenge is baseless. Contrary to the Government Development Bank's argument, *see* GDB Br. 41-52, "[n]othing in [the Bankruptcy Code's] legislative history indicates that Congress intended to exempt Puerto Rico from section 903(1)'s expressly universal preemption purview." Add. 38. Indeed, the legislative history shows that the district court's interpretation of the Section 903(1) advanced Congress's goal of a stable bankruptcy system across all jurisdictions. Add. 37-42; *see infra* at 15-17. The central purpose of Section 903(1) was to prevent the States from "enact[ing] their own versions of Chapter 9," which would "frustrate the constitutional mandate of uniform bankruptcy laws." S. Rep. No. 95-989, at 110 (1978) (citations and quotations omitted).

The Commonwealth makes a slightly different argument, contending that the history upon which the district court seized is not relevant to the matters at issue here and the legislative record is otherwise silent on this question. Comm. Br. 41-44. But not only is that wrong, it does not advance the Commonwealth's cause

because Section 903(1)'s text fully supports the district court's interpretation. As this Court has explained, "even when a statute effectuates a change to prior law, 'where the language is unambiguous, silence in the legislative history cannot be controlling.'" *In re Fahey*, 779 F.3d 1, 10 n.10 (1st Cir. 2015) (quoting *Dewsnup v. Timm,* 502 U.S. 410, 419-20 (1992)). That is precisely the case here. The statutory text plainly shows that Puerto Rico's Recovery Act is covered by Section 903(1)'s preemptive sweep. Any purported absence of an explanation for Congress's decision in the legislative history could not alter that conclusion.

PREPA takes the broadest position, arguing that the district court was required to uphold the Recovery Act unless the legislative history affirmatively established that "Congress intended to *preclude* Puerto Rico from exercising this power." Brief for the Puerto Rico Electric Power Authority as Amicus Curiae ("PREBA Br.") at 20 (emphasis in original). But there is *no* support for the proposition that the legislative history must reveal a specific intent on Congress's part to take certain action before turning to the statutory text to see if it conforms with that intent. Courts turn to legislative history "to corroborate" the better reading of the text of a statute, *In re Marrama*, 430 F.3d 474, 480 (1st Cir. 2005) (citing *In re LAN Tamers, Inc.,* 329 F.3d 204, 210 (1st Cir. 2003)), not to compel Congress to abide an invented clear-statement rule that would require the

legislative history to repeat verbatim what is already apparent from the ordinary meaning of the words in the statute.

In the end, the district court got it exactly right. The district court understood that the "starting point" of the "inquiry is the text of the statute itself," *United States v. Gelin*, 712 F.3d 612, 617 (1st Cir. 2013), and that legislative history could be useful "to corroborate 'that the statute's plain meaning does not lead to absurd results.'" *Id.* (quoting *In re Rudler,* 576 F.3d 37, 44-45 (1st Cir. 2009) (other citations omitted)). Far from producing absurd results, interpreting Section 903(1) to deny Puerto Rico the authority to create its own municipal bankruptcy scheme without the consent of the creditors advanced Congress's paramount goal of bankruptcy uniformity. The district court's thoughtful decision can and should be affirmed on this basis.

## II.    Upholding Laws Such As The Recovery Act Could Jeopardize The Federal Interest In Bankruptcy Uniformity And Significantly Disrupt The National Economy.

As the Constitution announces, uniformity was the animating principle behind the Framers' decision to grant Congress plenary authority to create a federal bankruptcy system. "[T]he American Colonies, and later the several States, had wildly divergent schemes for discharging debtors and their debts." *Cent. Virginia Cmty. Coll. v. Katz*, 546 U.S. 356, 365 (2006); *see also* 3 M. Farrand, *Records of the Federal Convention of 1787*, pp. 539, 547-548 (1911) (recognizing

the lack of uniform bankruptcy law as a defect of the Articles of Confederation).
"In England, where there was only one sovereign, a single discharge could protect
the debtor from his jailer and his creditors." *Katz*, 546 U.S. at 366. But "the
uncoordinated actions of multiple sovereigns, each laying claim to the debtor's
body and effects according to different rules, rendered impossible so neat a
solution on this side of the Atlantic." *Id.* "The States' practice of enacting private
bills" likewise "had rendered uniformity impossible." *Ry. Labor Executives' Ass'n
v. Gibbons*, 455 U.S. 457, 472 (1982).

The path to the Bankruptcy Clause's ratification thus was marked by a
"general agreement on the importance of authorizing a uniform federal response to
the problems" and "difficulties posed by [the] patchwork of insolvency and
bankruptcy laws" that existed prior to the Constitutional Convention. *Katz*, 546 at
369, 366; *see also id.* at 363 ("Foremost on the minds of those who adopted the
Clause were the intractable problems, not to mention the injustice, created by one
State's imprisoning of debtors who had been discharged (from prison and of their
debts) in and by another State."). "As it was easy to foresee that there would be
many business transactions and much commercial intercourse between the citizens
of the several states which would necessarily produce considerable individual
indebtedness, which might result in extensive financial embarrassments, it was
obvious to the framers of the federal constitution that the benefits of a wise,

16

humane and general system of bankruptcy, which might, under certain exigencies, become necessary to promote the happiness and commercial prosperity of the nation, could only be effectually established by the federal government adopted by the people of the several states for general and national purposes." *In re Jordan*, 13 F. Cas. 1079, 1080 (W.D.N.C. 1873).

Of course, "for laws to be uniform, the laws must be the same everywhere." *In re Hood*, 319 F.3d 755, 764 (6th Cir. 2003). "[I]f each State had power to prescribe a distinct rule, there could be no uniform rule." The Federalist No. 32*, at* 155 (A. Hamilton) (George W. Carey & James McClellan eds., 2001). The federal bankruptcy power therefore reflected

> the importance of preserving harmony, promoting justice, and securing equality of rights and remedies among the citizens of all the states. It is obvious that if the power is exclusively vested in the states, each one will be at liberty to frame such a system of legislation upon the subject of bankruptcy and insolvency, as best suits its own local interests and pursuits. Under such circumstances no uniformity of system or operations can be expected.

2 Joseph Story, Commentaries on the Constitution of the United States § 1107 (2d ed. 1851). In sum, the Clause was seen "as a grant of power to safeguard the nation's interest in establishing and maintaining a single market for the extension of credit without interference from parochial or otherwise obstreperous action on the part of the states." Judith Schenck Koffler, *The Bankruptcy Clause and*

*Exemption Laws: A Reexamination of the Doctrine of Geographic Uniformity*, 58 N.Y.U. L. Rev. 22, 41 (1983).

The Recovery Act is just the kind of parochial legislation the Framers had in mind. With the Recovery Act, the Commonwealth has created a bankruptcy system strictly for the benefit of Puerto Rico public utilities, *see* Recovery Act, Statement of Motives § E, at the expense of out-of-state creditors like Appellees. The claims that the Recovery Act "simply represents Puerto Rico's considered decision to fill the gap left by the inapplicability of Chapter 9 to the Commonwealth's public corporations, agencies, and instrumentalities" is not true. Comm. Br. 31-32. The law grants Puerto Rico municipalities like PREPA far greater rights vis-à-vis their creditors than Chapter 9 ever would afford them. *See, e.g.*, Recovery Act §§ 115(b), 202(d), 332(c)(2)(A). The Recovery Act is, in truth, a transparent attempt to protect a narrow set of financially distressed local interests from their creditors. In many ways, then, it resembles the notorious private bills that led the Framers to grant Congress the exclusive power to shape the uniform, nationwide system the Bankruptcy Code now embodies. *See Ry. Labor Executives' Ass'n*, 455 U.S. at 471 ("A law can hardly be said to be uniform throughout the country if it applies only to one debtor and can be enforced only by the one bankruptcy court having jurisdiction over that debtor.").

18

Not only would Appellants' reading allow the Commonwealth to specially privilege its instrumentalities, it would lead to a serious departure from Congress's goal of bankruptcy. There can be no dispute that whatever rule applies to Puerto Rico must also apply to the District of Columbia and other territories. *See* 11 U.S.C. § 101(52). At the very least, then, all non-States would be able to institute municipal bankruptcy systems notwithstanding the fact that the Bankruptcy Code was enacted to ensure uniformity across the entire United States. *See id*. § 101(55) ("The term 'United States', when used in a geographical sense, includes all locations where the judicial jurisdiction of the United States extends, including territories and possessions of the United States.").

Worse still, the harm caused by allowing the Commonwealth to frustrate the Framers' design and Congress's expressed intent cannot be cordoned off to Puerto Rico, the District of Columbia, and other territories. As explained above, under Appellants' interpretation, *any* State can secure the free rein to enact a competing bankruptcy system that Puerto Rico has claimed for itself simply by denying to its municipalities authority to seek Chapter 9 protection. *See supra* at 10-11. Once it does, Section 903(1) is rendered inapplicable because the law "by its plains terms applies only to state laws that purport to bind the nonconsenting 'creditor' of a municipality, and a municipality cannot have such a 'creditor' unless it is a 'debtor.'" Comm. Br. 27-28. Try as they might, Appellants are unable to muster a

plausible textual basis for confining this interpretation to Puerto Rico, the District of Columbia, or other territories.

If Appellants prevail, then the States will have every reason to follow the Commonwealth's lead. History teaches that, having felt the sting of Puerto Rico's protectionism, they will respond in kind. 2 Story, *supra*, at § 1107 ("[D]iversities of almost infinite variety and object may be introduced into the local system, which may work gross injustice and inequality, and nourish feuds and discontents in neighboring states. What is here stated, is not purely speculative. It has occurred among the American states in the most offensive forms, without any apparent reluctance or compunction on the part of the offending state."). If Puerto Rico is allowed to protect its municipalities from out-of-state creditors, including those from California, then California is going to protect its municipalities from out-of-state creditors, including those from New York, and New York is going to protect its municipalities from out-of-state creditors, including those from Illinois, and on it will go. "There will always be found in every state a large mass of politicians, who will deem it more safe to consult their own temporary interests and popularity, by a narrow system of preferences, than to enlarge the boundaries, so as to give distant creditors a fair share of the fortune of a ruined debtor. There can be no other adequate remedy, than giving a power to the general government, to introduce and perpetuate a uniform system." *Id.*

While this brand of favoritism will be in each State's short-term financial interest, it will cause serious long-term damage to the national economy. The availability of credit is the lifeblood of a capitalistic economy. "Acting as the nervous system of the economy, credit permits the pooling of capital assets from diverse sources and their rapid deployment in response to supply and demand signals, eliminating geographical barriers to investment." Richard C. Sauer, *Bankruptcy Law and the Maturing of American Capitalism*, 55 Ohio St. L.J. 291, 294-95 (1994) (citations omitted); *see* Edward Everett, *Accumulation, Property, Capital, and Credit,* 1 Hunt's Merchants' Mag. 21, 27 (1839) ("Credit has built cities, cleared wilderness, and bound the remotest parts of the continent together with chains of iron and gold.").

The bond market has been especially important to municipalities and other instrumentalities of local government looking to fund infrastructure projects. "The municipal bond market has been a key, low-cost source of infrastructure financing in the United States since the mid-1800s .... Municipal bonds are used to finance a broad spectrum of public infrastructure, such as roads, bridges, airports, utility systems, schools, hospitals, courthouses, jails, administrative offices, and other public facilities." National Association of Bond Lawyers, *Tax Exempt Bonds: Their Importance to the National Economy and to State and Local Governments*, White Paper (Sept. 2012). This is a massive capital market. From 1991 to 2007,

about three-quarters of the $1.7 trillion of "tax-exempt debt issued to finance new infrastructure projects … were used for capital spending on infrastructure by states and localities." *Id*.

The market's durability is essential to the health of the broader economy. "Business depends on airports, highways, and electric, water and sewer utilities and upon quality education systems to provide an educated workforce. A lack of investment in infrastructure will hurt long-term economic growth and, in the short term, result in loss of construction-related jobs." *Id*. "To the extent that the cost of borrowing to state and local government increases, unless substantial amounts of other federal funds, including grants, are made available to compensate them for the higher costs of taxable debt, state and local governments will be discouraged from such infrastructure investments." *Id*. In the words of Senator Charles Schumer of New York, "[c]reating a disincentive for banks to hold these bonds could slow or even stop major infrastructure projects in their tracks." Jesse Hamilton and Cheyenne Hopkins, *Regulator Fight Over Munis Threatens New School for Your Kid*, Bloomberg Business (Mar. 18, 2015).

Although many factors bear on the investment decisions of individuals and firms with excess capital, their ability to enforce repayment terms is chief among them. "The primary function of the bankruptcy system is to continue the law-based orderliness of the open credit economy in the event of a debtor's inability or

unwillingness generally to pay his debts. Especially from creditors' perspectives, it is important to have rules that determine rights generally in the debtor's wealth, wherever situated, and thus guide conduct in the open credit economy, as well as collective processes which effect such rules and permit creditors to realize on their claims." Communication From the Executive Director, Commission on the Bankruptcy Laws of the United States Transmitting a Report of the Commission on the Bankruptcy Laws of the United States, July 1973, H.R. Doc. No. 137, Parts I, at 71 93d Cong., 1st Sess. (1973); *In re Westmoreland Coal Co.*, 213 B.R. 1, 6 (Bankr. D. Colo. 1997) ("For creditors, the statutory framework provides a predictable and orderly system for liquidation or reorganization of the debtor with repayment through equitable distribution.").

The rule that Appellants advocate will deprive creditors, as to municipalities, of the stability and predictability needed for this market to function properly. It will be difficult, if not impossible, to rationalize investment in municipal bonds *ex ante* if the States are free to impair creditors' contractual rights on terms of their own choosing via an alternative *ex post* bankruptcy system like the Recovery Act. "Under a stable system of debt relief, however, it is often possible to calculate the risk of nonperformance occasioned by bankruptcy and fairly allocate it among contracting ventures. Put differently, bankruptcy becomes a mechanism of risk sharing, rather than risk shifting, when systematically administered." Sauer, *supra*

at 300-01. For low-cost capital to remain broadly available, investors must have the certainty that municipalities will be permitted to reorganize their debt on the terms set forth in Chapter 9 or not at all.

That result can only be assured by affirming the district court's judgment that Chapter 9 remains the uniform mechanism for restructuring municipal debt. Appellants' preferred interpretation of Section 903(1) will allow each State in the Union to circumvent Chapter 9 by disabling its municipalities from seeking relief through the federal system. What type of alternative bankruptcy system each State adopts and how that system will treat creditors is anyone's guess. But what is certain is that the patchwork of regimes that will take the place of the uniform bankruptcy system the Framers created and Congress has implemented will cause real damage to the economy.

## **CONCLUSION**

The Court should affirm the district court's judgment.

Respectfully submitted,

By:  *s/ William S. Consovoy*

Kate Comerford Todd
Steven P. Lehotsky
U.S. CHAMBER LITIGATION
CENTER, INC.
1615 H St., NW
Washington, DC 20062

William S. Consovoy
Thomas R. McCarthy
J. Michael Connolly
CONSOVOY MCCARTHY PLLC
3033 Wilson Blvd., Suite 700
Arlington, VA 22201
Tel: 703.243.9423
Fax: 703.243.9423
Email: will@consovoymccarthy.com

*Counsel for Amicus Curiae*

Dated: April 15, 2015

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(a)(7)(C), undersigned counsel certifies that this brief:

(i)     complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 5,619 words, including footnotes; and

(ii) complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14-point font

<div style="margin-left:40%;">

*s/ William S. Consovoy*
William S. Consovoy
CONSOVOY MCCARTHY PLLC
3033 Wilson Blvd., Suite 700
Arlington, VA 22201
Tel: 703.243.9423
Fax: 703.243.9423
Email: will@consovoymccarthy.com

*Counsel for Amicus Curiae*

</div>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 15, 2015, an electronic copy of the foregoing was filed with the Clerk of Court for the United States Court of Appeals for the First Circuit using the Court's CM/ECF system and was served electronically by the Notice of Docket Activity upon the registered CM/ECF participants listed below:

Alejandro Febres-Jorge, Esq.
GOVERNMENT DEVELOPMENT
   BANK FOR PUERTO RICO
Roberto Sánchez Vilella
Government Center
De Diego Avenue No. 100
Santurce, P.R.  00907-2345
(787) 729-6438

Martin J. Bienenstock, Esq.
Sigal P. Mandelker, Esq.
Mark D. Harris, Esq.
PROSKAUER ROSE LLP
Eleven Times Square
New York, N.Y.  10036
(212) 969-3000

*Counsel for Defendants-Appellants Melba Acosta-Febo & John Doe, as Agents for the Government Development Bank for Puerto Rico*

Margarita Mercado-Echegaray, Esq.
Solicitor General
COMMONWEALTH OF
   PUERTO RICO
P.O. Box 9020192
San Juan, P.R.  00902-0192
(787) 724-2165

Christopher Landau, Esq.
Beth A. Williams, Esq.
Michael A. Glick, Esq.
Claire M. Murray, Esq.
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005
(202) 879-5000

*Counsel for Defendants-Appellants Alejandro Garcia-Padilla, et al.*

27

Manuel Fernández-Bared, Esq.
Linette Figueroa-Torres, Esq.
TORO, COLÓN, MULLET, RIVERA &
    SIFRE, P.S.C.
P.O. Box 195383
San Juan, P.R.  00919
(787) 751-8999

Thomas Moers Mayer, Esq.
Philip Bentley, Esq.
David E. Blabey Jr., Esq.
KRAMER LEVIN NAFTALIS &
    FRANKEL LLP
1177 Avenue of the Americas
New York, N.Y.  10036
(212) 715-9100

*Counsel for Plaintiffs-Appellees Franklin Cal.
Tax-Free Trust, et al.*

Jorge R. Roig, Esq.
Joanne A. Tomasini-Muñiz, Esq.
GONZÁLES, MACAHDO & ROIG, LLC
Citibank Tower, Suite 601
252 Ponce de León Avenue
San Juan, P.R.  00918
(787) 773-6363
Lawrence B. Friedman, Esq.
Richard J. Cooper, Esq.
Lewis J. Liman, Esq.
Sean A. O'Neal, Esq.
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, N.Y.  10006
(212) 225-2000


*Counsel for Amicus Curiae Puerto Rico Electric Power Authority*


Gabriel R. Avilés-Aponte, Esq.
TAPIA & AVILÉS
Cond. First Federal, Suite 601
Ave. Muñoz Rivera #1056
San Juan, P.R.  00927
(787) 764-1430

*Counsel for Amici Curiae Professors Clayton P. Gillette and
David A. Skeel, Jr.*

Edilberto Berríos Pérez, Esq.
REC LAW SERVICES PSC
#239 Arterial Hostos Ave., Suite 900
Capital Center Bldg.
San Juan, P.R.  00918-1400
(787) 753-0884

*Counsel for Amicus Curiae Edilberto Berríos Pérez, Esq.*

Marc E. Kasowitz
Daniel R. Benson
Hon. Joseph I. Lieberman (Ret.)
Hon. Clarine Nardi Riddle (Ret.)
Andrew K. Glenn
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, N.Y.  10019
(212) 506-1700

*Counsel for Amicus Curiae the Association of Financial
Guaranty Insurers*

30

David C. Indiano
Jeffrey M. Williams
Leticia Casalduc-Rabell
INDIANO & WILLIAMS, PSC
207 Del Parque St., 3d Floor
San Juan, P.R.  00912
(787) 641-4545

Theodore B. Olson
Matthew D. McGill
Scott G. Stewart
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
MMcGill@gibsondunn.com

Matthew J. Williams
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, N.Y.  10166
(212) 351-2322

*Counsel for Plaintiff-Appellee BlueMountain Capital Management, LLC*

*s/ William S. Consovoy*
William S. Consovoy
CONSOVOY MCCARTHY PLLC
3033 Wilson Blvd., Suite 700
Arlington, VA 22201
Tel: 703.243.9423
Fax: 703.243.9423
Email: will@consovoymccarthy.com

*Counsel for Amicus Curiae*