Nos. 15-1218, 15-1221, 15-1271, 15-1272

IN THE

# United States Court of Appeals

## FOR THE FIRST CIRCUIT

◆◆◆

FRANKLIN CALIFORNIA TAX-FREE TRUST, *et al.*,

*Plaintiffs-Appellees,*

—v.—

THE COMMONWEALTH OF PUERTO RICO, *et al.*,

*Defendants-Appellants.*

BLUEMOUNTAIN CAPITAL MANAGEMENT, LLC,

*Plaintiff-Appellee,*

—v.—

ALEJANDRO GARCIA-PADILLA, In His Official Capacity as Governor
of the Commonwealth of Puerto Rico, *et al.*,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO (BESOSA, J.)
CIVIL ACTION NOS. 3:14-CV-1518 AND 3:14-CV-1569

## BRIEF FOR THE ASSOCIATION OF FINANCIAL GUARANTY INSURERS AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES SEEKING AFFIRMANCE

MARC E. KASOWITZ
DANIEL R. BENSON
HON. JOSEPH I. LIEBERMAN (RET.)
HON. CLARINE NARDI RIDDLE (RET.)
ANDREW K. GLENN
KASOWITZ, BENSON, TORRES
   & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
(212) 506-1700

*Attorneys for Amicus Curiae
   the Association of Financial
   Guaranty Insurers*

# DISCLOSURE STATEMENT

Proposed *amicus curiae* Association of Financial Guaranty Insurers ("AFGI") is a trade association whose members are ACA Financial Guaranty Corporation, Ambac Assurance Corporation, American Overseas Reinsurance Company Limited, Assured Guaranty Corp., Assured Guaranty Municipal Corp., CIFG Assurance North America, Inc., Financial Guaranty Insurance Company, MBIA Insurance Corp., Municipal Assurance Corp., National Public Finance Guarantee Corp., and Syncora Guarantee.  AFGI does not have any parents or subsidiaries, and no publicly-held corporation has a 10% or greater ownership interest in AFGI.

# TABLE OF CONTENTS

**Page**

STATEMENT OF IDENTITY AND INTEREST OF *AMICUS CURIAE*.............. 1

STATEMENT REGARDING AUTHORSHIP OF *AMICUS CURIAE* BRIEF ...... 4

SUMMARY OF ARGUMENT ........................................................... 4

ARGUMENT.................................................................................. 9

I.    PERMITTING TERRITORIES (AND STATES) TO ENACT
      THEIR OWN MUNICIPAL BANKRUPTCY LAWS WOULD
      HAVE SIGNIFICANT NEGATIVE CONSEQUENCES
      ON THE $4 TRILLION MUNICIPAL BOND INDUSTRY ...................... 9

      A.    The Significance of the Municipal Bond Market................................ 9

      B.    The Importance of Predictability and Uniformity
            in the Municipal Bond Market ........................................................10

      C.    The Statutory Framework .................................................12

      D.    Appellants' Position Would Lead to Absurd Outcomes
            and Significant Adverse Effects on the Municipal Bond Market.......14

II.   APPELLANTS AND THEIR *AMICI* PRESENT A GROSSLY
      INACCURATE PICTURE OF THE "CATASTROPHES"
      THAT PURPORTEDLY AWAIT THE CITIZENS OF
      PUERTO RICO WITHOUT THE RECOVERY ACT...............................20

      A.    The Recovery Act is Unnecessary to
            Maintain PREPA's Operations.........................................................21

      B.    Creditors Have No Claim on Public Assets.......................................25

      C.    Negotiations Based Upon the Pre-Existing Contractual and Statutory
            Framework Provide the Proper -- and Best -- Framework for
            Addressing Puerto Rico's Financial Difficulties .............................26

CONCLUSION .................................................................................32

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)................................33

# TABLE OF AUTHORITIES

CASES                                                                          Page(s)

*In re City of Detroit, Mich.*,
    504 B.R. 97 (Bankr. E.D. Mich. 2013) ........................................................27

*In re City of Vallejo*,
    408 B.R. 280 (B.A.P. 9th Cir. 2009) ...........................................................27

*Griffin v. Oceanic Contractors, Inc.*,
    458 U.S. 564 (1982) ...................................................................................19

*In re Jefferson County, Ala.*,
    474 B.R. 228 (2012) ..............................................................................30-31

STATUTES

11 U.S.C. § 101(40) ..........................................................................................1, 14

11 U.S.C. § 101(52) ........................................................................................14, 16

11 U.S.C. § 109(c) ...........................................................................17, 19, 22, 27

11 U.S.C. § 903(1) ...................................................................................*passim*

Act of Aug. 16, 1937, ch. 657, §§ 81-82, 83(a), 50 Stat. 653 ...............................12

P.R. Laws Ann. Tit 22 § 207 .........................................................................28-29

P.R. Laws Ann. Tit 22 § 208 ...............................................................................28

Pub. L. No. 481, § 83(i), 60 Stat. 409, 415 (1946) ......................................12, 13

Puerto Rico Public Corporation Debt Enforcement and Recovery Act,
    2014 P.R. Laws Act No. 71 ...................................................................*passim*

OTHER AUTHORITIES

H.R. Rep. No. 79-2246 (1946) .........................................................5, 13, 15, 20

S. Rep. No. 95-989 (1978) .......................................................................13, 20

Lorraine S. McGowen, *Puerto Rico Adopts a Debt Recovery Act for Its Public Corporations*, 10 PRATT'S J. BANKR. L. 453 (Sep. 2014) .................................18

Amy B. Monahan, *State Fiscal Constitutions and the Law and Politics of Public Pensions*, 2015 U. Ill. L. Rev. 117 (2015) ..................................................17, 18

*Puerto Rico Passes New Municipal Reorganization Act*, 128 HARV. L. REV. 1320 (Feb. 2015) ............................................................17

Michael Aneiro, *Puerto Rico PREPA Utility Names Chief Restructuring Officer*, BARRON'S (Sep. 4, 2014), *available at* http://blogs.barrons.com/incomeinvesting/2014/09/04/puerto-rico-prepa-utility-names-chief-restructuring-officer/ ........................................................................23, 24

*The Association of Financial Guaranty Insurers: The Basics*, *available at* http://afgi.org/who-fact.htm (last visited April 15, 2015)..............10

Lisa Beilfuss, *Puerto Rico Utility Bondholders Unveil $2 Billion Plan*, WALL STREET JOURNAL (Apr. 1, 2015), *available at* http://www.wsj.com/articles/puerto-rico-utility-bondholders-unveil-2-billion-plan-1427918547 ................................................24

Nick Brown, *Creditors offer Puerto Rico's troubled utility $2 billion financing*, REUTERS (Mar. 28, 2015), *available at* http://www.reuters.com/article/2015/03/28/us-usa-puertorico-prepa-idUSKBN0MO0VE20150328 ................24

Nick Brown & Tom Hals, *Puerto Rico debt crisis headed for U.S.-style bankruptcy resolution*, REUTERS (July 23, 2014), *available at* http://www.reuters.com/article/2014/07/23/us-puertorico-debt-analysis-idUSKBN0FS0A420140723 ......................................................................21, 22

Mike DeBonis, *After 10 years, D.C. control board is gone but not forgotten*, THE WASHINGTON POST (Jan. 30, 2011), *available at* http://www.washingtonpost.com/local/after-10-years-dc-control-board-is-gone-but-not-forgotten/2011/01/30/AB5485Q_story.html ...........16, 30

Michelle Kaske, *Puerto Rico Power Bonds Rise After Judge Throws Out Debt Law*, BLOOMBERG (Feb. 9, 2015), *available at* http://www.bloomberg.com/news/articles/2015-02-09/puerto-rico-power-bonds-rise-after-judge-throws-out-new-debt-law ................................................12

iii

Aaron Kuriloff, *Puerto Rico Power Buys Time From Creditors*,
WALL STREET JOURNAL (Aug. 14, 2014), *available at*
http://www.wsj.com/articles/puerto-rico-power-buys-
time-from-creditors-1408062487 ....................................................................23

Kris Maher, *Harrisburg Will Exit State Receivership*,
WALL STREET JOURNAL (Feb. 26, 2014), *available at*
http://www.wsj.com/articles/
SB10001424052702304709904579407431943602344 ....................................30

Jamie Mason, *Harrisburg, creditors reach debt restructuring deal*,
THE DEAL PIPELINE (Sep. 1, 2013), *available at*
http://www.thedeal.com/content/restructuring/harrisburg-
creditors-reach-debt-restructuring-deal.php ...............................................27, 28

Kevin Mead, *Prepa Extends Business Plan to 10 Years*,
CARIBBEAN BUSINESS (Apr. 6, 2015), *available at*
http://www.caribbeanbusinesspr.com/news/prepa-extends-
business-plan-to-10-years-102832.html ...........................................................24

Frank Moore, *Does Bond Insurance Make Sense For You?*
GOVERNMENT FINANCE REVIEW (Aug. 2002) ...................................................10

*Puerto Rico Bonds Decline Following Recovery Act*,
FITCH WIRE (July 11, 2014), *available at* https://www.fitchratings.com/
gws/en/fitchwire/fitchwirearticle/Puerto-Rico-Bonds?pr_id=839103 ...............12

Sam Roberts, *When New York Teetered on the Brink of Bankruptcy*,
NEW YORK TIMES (July 26, 2013), *available at*
http://cityroom.blogs.nytimes.com/2013/07/25/
when-new-york-teetered-on-the-brink-of-bankruptcy/ ....................................27

SEC, *Report on the Municipal Securities Market* (July 31, 2012), *available at*
http://www.sec.gov/news/studies/2012/munireport073112.pdf ................... 9-10

William Selway, *Puerto Rico Municipal Bankruptcy Proposed
in U.S. House Bill*, BLOOMBERG (July 31, 2014), *available at*
http://www.bloomberg.com/news/articles/2014-07-31/puerto-
rico-municipal-bankruptcies-proposed-in-u-s-house-bill.................................16

iv

Robert Slavin, *PREPA Bondholder Expects Favorable Restructuring*,
THE BOND BUYER (Mar. 23, 2015), *available at*
http://www.bondbuyer.com/news/regionalnews/prepa-
bondholder-expects-favorable-restructuring-1071633-1.html .........................23

Robert Slavin, *PREPA Downgraded as Payment Comes Due*,
THE BOND BUYER (July 1, 2014), *available at*
http://www.bondbuyer.com/news/regionalnews/
prepa-downgraded-as-payment-comes-due-1064038-1.html...........................23

Robert Slavin, *PREPA Restructuring Officer Optimistic on Consensual Plan*,
THE BOND BUYER (Apr. 9, 2015), *available at*
http://www.bondbuyer.com/news/regionalnews/prepa-
restructuring-officer-optimistic-on-consensual-plan-1072127-1.html .............25

Robert Slavin, *PREPA's Expected Default Is Now Avoidable*,
THE BOND BUYER (Apr. 1, 2015), *available at*
http://www.bondbuyer.com/news/regionalnews/
no-default-for-prepa-1071897-1.html...............................................................24

Reid Wilson, *Looming Puerto Rico debt deadlines have investors nervous*,
WASHINGTON POST (July 24, 2014), *available at*
http://www.washingtonpost.com/blogs/govbeat/wp/2014/07/24/
looming-puerto-rico-debt-deadlines-have-investors-nervous/ ..........................12

## STATEMENT OF IDENTITY AND INTEREST OF *AMICUS CURIAE*

AFGI is the national trade association of the leading insurers and reinsurers of municipal bonds and asset-backed securities. AFGI's eleven members[1] are often called "monoline" insurers because their business is singularly focused on financial guaranty and related insurance. For decades, financial guaranty insurers have served an important function by insuring many of the nation's $4 trillion in municipal bonds, thereby permitting municipalities to borrow at lower rates, providing substantial cost savings and facilitating capital market access for municipal issuers and the communities they serve.

AFGI has a significant interest in the outcome of this case. In enacting the Puerto Rico Public Corporation Debt Enforcement and Recovery Act ("Recovery Act"), the Commonwealth of Puerto Rico sought to unilaterally restructure or abrogate statutory and contractual terms of municipal bonds and their governing trust agreements -- terms to which the Commonwealth and its public corporations[2]

---

[1]   The AFGI member firms are ACA Financial Guaranty Corporation, Ambac Assurance Corporation, American Overseas Reinsurance Company Limited, Assured Guaranty Corp., Assured Guaranty Municipal Corp., CIFG Assurance North America, Inc., Financial Guaranty Insurance Company, MBIA Insurance Corp., Municipal Assurance Corp., National Public Finance Guarantee Corp., and Syncora Guarantee.

[2]   The Recovery Act refers to "public corporations," which fall within Chapter 9's definition of a "municipality." 11 U.S.C. § 101(40). For ease of reference, this brief refers to both public corporations and municipalities as "municipalities."

agreed when they obtained billions of dollars of financing.  Much of this financing has been guaranteed by AFGI members, who, at the request of the Commonwealth and in reliance on, and subject to, those contractual terms, provided the Commonwealth's municipal bondholders with insurance policies for their bonds.

In striking down the Recovery Act, the District Court correctly held it unconstitutional on preemption grounds, finding that the Recovery Act would cause the "nullification" (Opinion & Order at 27) and "drastic impairment" (*id.* at 63) of the plaintiff bondholders' rights and remedies under the trust agreement governing their bonds.  So too, the Recovery Act would nullify and impair contractual and statutory rights and remedies of AFGI members who insured Commonwealth municipal bonds in reliance on and subject to their rights and remedies.

AFGI's interest in the outcome of this case also extends well beyond the debt issued by Puerto Rico and its municipalities.  If the Appellants' flawed arguments in support of the validity of the Recovery Act were to succeed, the repercussions would extend far beyond Puerto Rico's borders.  Not only would Puerto Rico be free to draft its own varying and *ad hoc* municipal bankruptcy laws, but under those same flawed arguments, even the *States* could claim the same right.

The prospect of States or territories enacting their own municipal bankruptcy laws would have grave consequences on the monoline insurance industry, as well as on the municipal bond market as a whole.  Upholding the Recovery Act would establish, and signal to monoline insurers and other creditors, that contractual terms with municipalities could be altered in unpredictable and inconsistent ways. This would create a chilling effect on credit markets and increase the cost of financing to municipal borrowers (and, therefore, to taxpayers).

AFGI therefore submits this *amicus* brief to raise two considerations for the Court that are of significant importance to its members.

*First*, permitting territories (and States) to enact their own municipal bankruptcy laws outside Chapter 9 of the Bankruptcy Code would have significant adverse consequences on the $4 trillion municipal bond industry in general, and on the monoline insurance industry in particular.  These adverse consequences ultimately will harm municipalities themselves, as well as their citizens and other stakeholders.

*Second*, Appellants and supporting *amici* present a grossly inaccurate picture of the purported "catastrophes" that supposedly await the Puerto Rican people without the Recovery Act.  This false portrayal of the potential impact of applying existing federal and Commonwealth law to the bond contracts at issue is a misleading attempt to shift focus from the straightforward issue of federal

3

preemption here -- which the District Court stated was "not a close case" (Op. & Order at 42) -- and from the dramatic negative effects that permitting laws like the Recovery Act would have on the nationwide municipal securities market.

## STATEMENT REGARDING AUTHORSHIP
## OF *AMICUS CURIAE* BRIEF

AFGI and its counsel are the sole authors of this brief.  No party, party's counsel or other person has authored this brief in whole or in part, or contributed money that was intended to fund the preparation or submission of this brief.

## SUMMARY OF ARGUMENT

This appeal presents an important opportunity for this Court to affirm the primary role and interest of the Federal government in enacting uniform bankruptcy laws in accordance with the constitutional mandate of Article I, Section 8 of the United States Constitution, including, in particular, bankruptcy laws governing the crucial $4 trillion municipal bond market.  In holding that the Recovery Act is preempted by federal bankruptcy law, the District Court correctly applied the statutory language of, and Congressional intent behind, Section 903(1) of the Bankruptcy Code.  Significantly for AFGI and its members, who participate in the market as "monoline" insurers for municipal bonds, the District Court's proper application of the law averted a disaster in the making in that critically important market.

4

Investors, issuers, and insurers in the nation's enormous municipal bond market depend on certainty and uniformity in the bankruptcy laws across the United States.  It is this need for uniformity and predictability in this market that led Congress to enact Section 903(1) of the Bankruptcy Code, which ensures that "[o]nly under a Federal law should a [municipality's] creditor be forced to accept [] an adjustment [to the municipality's obligation] without his consent."  H.R. Rep. No. 79-2246, at 4 (1946).  Congress recognized what AFGI's members and other market participants also recognize:  uncertainty concerning bankruptcy regimes would decrease the willingness of investors and insurers to participate in the market and increase their risk, leading them to demand higher returns, and would ultimately drive up the financing costs for municipalities pursuing significant, job-creating public projects.

Contrary to the strained and tortured reading proposed by Appellants, Section 903(1) plainly prohibits Puerto Rico from creating bankruptcy laws for its own municipalities.  The Recovery Act, which departs from Chapter 9 in key respects, is just such a law, and, if permitted to stand, would not only eviscerate Congress's intent in enacting Section 903(1), but would also deal a significant blow to the proper functioning of the municipal bond market across the country. The Recovery Act unconstitutionally impinges on, and is therefore preempted by, federal law, and the District Court properly struck it down.

5

Ignoring the significant harm on the national municipal bond market from the Recovery Act's enactment, Appellants and their *amici* posit that it is the *striking down* of the Recovery Act that will cause significant harm. They argue that, absent a federal bankruptcy law permitting involuntary restructuring of Puerto Rico's municipal debts, the Puerto Rico legislature had jurisdiction by necessity to enact the Recovery Act to address its municipalities' relationship with its creditors. Appellants and their *amici* claim that Puerto Rico's municipalities would be subject to a "race among creditors to the courthouse in a chaotic grab for [their] assets," ultimately resulting in their inability to serve Puerto Rico's citizens. PREPA Br. at 13. Appellants -- and particularly their supporting *amici* -- go so far as to argue that affirming the District Court's decision would unleash an unmitigated disaster upon the citizens of Puerto Rico, including "rolling blackouts," "inordinately high prices," "depopulation," and ultimately a "death spiral" from which the Puerto Rico Electric Power Authority ("PREPA") -- and possibly all of Puerto Rico -- will never recover. PREPA Br. at 2; Professor Br. at 19, 23-24.

Fortunately, this parade of horribles is entirely imagined. There will be no such results or repercussions. Apart from the fact that Congress clearly retained for itself -- and did not delegate to the Commonwealth's legislature -- the authority to enact a municipal bankruptcy scheme, the Appellants' imagined doomsday

6

scenario ignores the reality that PREPA's creditors themselves have strong incentives to avoid all of these theoretical harms, and that governing laws and applicable contractual provisions ensure that such harms do not occur. Because PREPA's bondholders have recourse only to PREPA's *revenues*, and not its *assets*, PREPA's bondholders share the same incentive as PREPA's customers: keeping PREPA operating (and serving PREPA's customers) as efficiently as possible. Indeed, even the legal remedy available to PREPA's bondholders as a last resort -- appointment of a court-supervised receiver -- would not lead to the harms claimed by Appellants and their *amici*, since Commonwealth law makes clear that the duties of a receiver are limited to the operation and maintenance of PREPA's facilities. Thus, as recent examples of other municipalities benefitting from the appointment of a receiver demonstrate, even in the worst case scenario, PREPA would continue to operate and provide services to the Commonwealth.

Indeed, since PREPA first found itself in serious financial distress last summer, PREPA's creditors have entered into repeated forbearance agreements with PREPA, worked with PREPA to retain a chief restructuring officer to operate more efficiently, and proposed a plan to restructure and refinance PREPA's debt, discussed in more detail below. Far from the overblown scenarios posited by Appellants and their *amici*, creditors have engaged in good-faith negotiations for a

consensual restructuring for the benefit of all constituents, including the citizens of Puerto Rico.

The Recovery Act is an unconstitutional exercise of power by the Commonwealth.  It violates the letter and intent of federal law in a misguided effort to address a problem for which there are existing solutions.  The existing legal and contractual framework governing the relationship between PREPA and its creditors has been, and will continue to be, valid and effective in addressing the very concerns Appellants have raised.  Moreover, reaffirming that individual States and territories may not implement their own individualized frameworks for municipal bankruptcies will go a long way toward reassuring the municipal bond market, and ensuring that that market remains available, affordable, and liquid, for municipalities around the country.  The District Court's opinion should be affirmed.

# ARGUMENT

I. **PERMITTING TERRITORIES (AND STATES) TO ENACT THEIR OWN MUNICIPAL BANKRUPTCY LAWS WOULD HAVE SIGNIFICANT NEGATIVE CONSEQUENCES ON THE $4 TRILLION MUNICIPAL BOND INDUSTRY**

The arguments of Appellants and their *amici* are meritless under governing federal law and contrary to Congress's intent, and, if accepted and carried to their logical and inescapable conclusion, would permit not only Puerto Rico, but all States and territories, to enact municipal bankruptcy laws inconsistent with the Chapter 9 system. This legally impermissible result would cause immeasurable and unjustified harm to the nation's $4 trillion municipal bond market, which finances many of the most important projects and services provided by the nation's municipalities, including those of Puerto Rico.

A. <u>The Significance of the Municipal Bond Market</u>

As the Securities & Exchange Commission ("SEC") recently put it in a Report on the Municipal Securities Market: "[t]he municipal securities market is critical to building and maintaining the infrastructure of our nation. State and local governmental entities issue municipal securities to finance a wide variety of public projects, to provide for cash flow and other governmental needs, and to finance non-governmental private projects." SEC, *Report on the Municipal Securities Market* (July 31, 2012), *available at* http://www.sec.gov/news/studies/2012/

9

munireport073112.pdf, at p.i.  As of the writing of the SEC's report, "there were

over one million different municipal bonds outstanding, in the total aggregate

principal amount of more than $3.7 trillion."  *Id.*  More than three-quarters of

municipal bonds are held directly or indirectly by individuals.  *Id.* at p.v.

 The monoline insurance companies that comprise AFGI's membership play

an important role in the municipal bond market.  Because the monoline insurers

historically have had higher credit ratings than the municipal borrowers whose

bonds they insure, monolines have enabled municipalities to obtain a lower cost of

financing than they would if their bonds were not insured by a monoline.  *See*

Frank Moore, *Does Bond Insurance Make Sense For You?*, GOVERNMENT FINANCE

REVIEW (Aug. 2002) at p.16.  In this way, monolines have saved municipal

borrowers -- and the taxpayers – more than $40 billion in interest costs since the

industry's inception in 1971.  *See The Association of Financial Guaranty Insurers:*

*The Basics*, *available at* http://afgi.org/who-fact.htm (last visited April 15, 2015).

 **B.**  **The Importance of Predictability and**
    <u>**Uniformity in the Municipal Bond Market**</u>

 The key to the municipal bond industry's ability to provide financing for

important public projects, and to the monoline industry's ability to lower the cost

of that financing, is the ability of participants in those industries to predict the

likelihood that a municipal borrower will default, and, equally important, the likely

consequences of any such default.  Thus, both industries depend on an established set of standards governing the actions that may be taken by key stakeholders upon the failure of a municipal borrower to pay its obligations.  The "rules of the game" must be consistent and evenly applied, and understood in advance.  If those who purchase or insure municipal bonds cannot rely on the contractual covenants and obligations to which they and their municipal counterparties agreed -- in particular, the process and availability of remedies upon a default -- it will have a chilling effect on the provision of credit.  The natural result will be an increase in costs, both to monolines and to the municipalities whose credit they enhance.

If bondholders and insurers must reevaluate their extension of credit on the basis that the longstanding obligations of issuers might be abrogated through the unilateral imposition of state laws that impair them, credit will become more expensive for all government issuers.  The consequences would be enormous, as the increased costs of issuing municipal debt either would be borne by the nation's taxpayers, or would lead municipalities to forgo key infrastructure projects in the face of unaffordable financing costs.  Indeed, since the Recovery Act was passed, Puerto Rico has had profound difficulty in accessing the capital markets, and the Recovery Act "has some economists worried that Puerto Rico could lose access to the bond market, on which it relies to finance ongoing government operations." Reid Wilson, *Looming Puerto Rico debt deadlines have investors nervous*,

11

WASHINGTON POST (July 24, 2014), *available at* http://www.washingtonpost.com/ blogs/govbeat/wp/2014/07/24/looming-puerto-rico-debt-deadlines-have-investors-nervous/.[3]

The possibility of this outcome was well understood by Congress, and was precisely what it sought to avoid, when it enacted Section 903(1) and its predecessor, Section 83(i).

## C.    <u>The Statutory Framework</u>

Since 1937, federal statutory law has governed the manner in which the municipalities of Puerto Rico, along with other territories and States, could engage in a non-consensual restructuring of debts.  *See* Act of Aug. 16, 1937, ch. 657, §§ 81-82, 83(a), 50 Stat. 653.  In 1946, Congress enacted Section 83(i) of the Bankruptcy Act, which explicitly preempted and prohibited States from enacting any state municipal bankruptcy laws that would bind non-consenting creditors. *See* Pub. L. No. 481, § 83(i), 60 Stat. 409, 415 (1946); 11 U.S.C. § 903(1).

---

[3]    In fact, when the Recovery Act was signed, PREPA's bonds were downgraded to well below investment grade, and the market value of PREPA's bonds fell by 41%.  *See Puerto Rico Bonds Decline Following Recovery Act*, FITCH WIRE (July 11, 2014), *available at* https://www.fitchratings.com/gws/en/fitchwire/ fitchwirearticle/Puerto-Rico-Bonds?pr_id=839103.  Conversely, when the District Court struck down the Recovery Act, the price of PREPA's bonds recovered ten points.  *See* Michelle Kaske, *Puerto Rico Power Bonds Rise After Judge Throws Out Debt Law*, BLOOMBERG (Feb. 9, 2015), *available at* http://www.bloomberg.com/news/articles/2015-02-09/puerto-rico-power-bonds-rise-after-judge-throws-out-new-debt-law.

Section 83(i), which later became Section 903(1) of the Bankruptcy Code, directly

applied to Puerto Rico, prohibiting it from binding non-consenting creditors to a

restructuring of municipal debts.  In enacting Section 83(i) in 1946, Congress

explained that:

> a bankruptcy law under which bondholders of a municipality are required to surrender or cancel their obligations should be uniform throughout the 48 States, as the bonds of almost every municipality are widely held.  *Only under a Federal law should a creditor be forced to accept such an adjustment without his consent.*

H.R. Rep. No. 79-2246, at 4 (1946) (emphasis added).  More than thirty years later,

Congress reaffirmed these principles by retaining Section 83(i) in the new

Bankruptcy Code; Congress recognized that removing the provision "would

'permit all States to enact their own versions of Chapter IX,' … which would

frustrate the constitutional mandate of uniform bankruptcy laws."  S. Rep. No. 95-

989, at 110 (1978).

In 1984, Congress revised the Bankruptcy Code to eliminate the ability of

municipalities in Puerto Rico and the District of Columbia to seek relief under

Chapter 9 by excluding Puerto Rico and the District of Columbia from the

definition of "State" for the purpose of "defining who may be a debtor under

chapter 9," but including Puerto Rico and the District of Columbia as "States" for

all other purposes.  11 U.S.C. § 101(52).

Thus, municipalities of Puerto Rico and the District of Columbia cannot be Chapter 9 debtors, but those federally-supervised jurisdictions remain subject to Section 903(1) of the Bankruptcy Code, which prohibits any "State law prescribing a method of composition of indebtedness of [a] municipality" that "bind[s] any creditor that does not consent to such composition." 11 U.S.C. § 903(1). With the exception of the limited Section 101(52) exclusion described above, which the District Court correctly held was inapplicable here (Op. & Order at 41-42), under the Bankruptcy Code, Puerto Rico is a "State," and its instrumentalities (such as PREPA) are "municipalities." 11 U.S.C. § 101(40) & (52). By its terms, therefore, Section 903(1) prohibits Puerto Rico from enacting a law for the restructuring of PREPA's debt.

### D. Appellants' Position Would Lead to Absurd Outcomes and Significant Adverse Effects on the Municipal Bond Market

The fundamental question on this appeal is whether, notwithstanding Congress's decision to preserve the application of Section 903(1) to Puerto Rico, the statute should be read to permit what it expressly bars. The question is not, as Appellants assert, "whether Congress [in 1984] intended to preclude Puerto Rico from enacting its own municipal bankruptcy law by excluding Puerto Rico from the scope of Chapter 9" (Commonwealth Appellants Br. at 42), but whether Congress in 1984 intended to lift the *existing*, 40-year-old restriction on Puerto

14

Rico's ability to enact its own bankruptcy laws, and give Puerto Rico *carte blanche* to enact such laws for the adjustment of its municipalities' debt -- regardless of the fairness of those laws, their consistency with the federal bankruptcy scheme, or their profound effects on the trillion-dollar market for municipal bonds.

The answer to this question is clear. Appellants provide no coherent explanation why Congress would provide Puerto Rico with the unfettered ability to treat its municipalities' creditors differently (and, in this case, worse) than those of every State of the Union. Nor do Appellants make any attempt to demonstrate that their interpretation is supported by the legislative history of the 1984 amendment to the Bankruptcy Code. And they do not explain how it would further the goals of the Bankruptcy Code, including that "[o]nly under a Federal law should a [municipality's] creditor be forced to accept [] an adjustment [to the municipality's obligation] without his consent." H.R. Rep. No. 79-2246, at 4 (1946). Instead, as the District Court correctly recognized -- and as the Commonwealth itself clearly understands[4] -- the only reasonable reading of Congress's 1984 revision of the

---

[4]   Clearly and justifiably concerned about the viability of the Recovery Act, on July 31, 2014, nearly a month after the Recovery Act was signed into law, Puerto Rico's delegate to the U.S. House of Representatives introduced a bill that would modify Section 101(52) to permit Commonwealth municipalities to seek protection under Chapter 9, stating that the bill would "enable the Puerto Rico government to authorize its government-owned corporations to utilize the tried-and-true Chapter 9

15

Bankruptcy Code is that Congress intended to, and did, reserve to *itself* the right to decide whether, if a fiscal emergency arose, it should authorize a framework for reorganizing municipal debts for Puerto Rico and the District of Columbia.  Op. & Order at 39.[5]

Appellants' answer to this is that, in enacting Section 101(52) in 1984, Congress exempted Puerto Rico and the District of Columbia from this structure, and instead freed them -- unlike the 50 States -- to each provide their own terms for the restructuring of distressed municipal debt.  But, again, Section 101(52) excludes Puerto Rico from the definition of "State" only for purposes of defining who may be a Chapter 9 debtor under Section 109(c); it does not exclude Puerto Rico from Section 903(1), which limits what "States" can do and is in no way dependent on who may be a debtor.  To accept Appellants' reading, one would not only have to ignore the plain language of Section 903(1), but would also have to

---

procedure if it becomes necessary, under the expert supervision of an impartial federal bankruptcy judge."  William Selway, *Puerto Rico Municipal Bankruptcy Proposed in U.S. House Bill*, BLOOMBERG (July 31, 2014), *available at* http://www.bloomberg.com/news/articles/2014-07-31/puerto-rico-municipal-bankruptcies-proposed-in-u-s-house-bill.

[5]   Indeed, Congress exercised this exact power in 1995, in response to a looming fiscal crisis in the District of Columbia.  Rather than modify Chapter 9 to permit the District to seek bankruptcy protection, Congress "wrested" the "day-to-day management of most District functions … from city officials and placed [it] in the hands of a five-member federally appointed panel."  Mike DeBonis, *After 10 years, D.C. control board is gone but not forgotten*, THE WASHINGTON POST (Jan. 30, 2011).

accept -- against all evidence to the contrary -- that while Congress said it intended to restrict State action in connection with municipal bankruptcies, it in fact simultaneously acted *sub silentio* to free Puerto Rico and the District of Columbia from all such restrictions. *See Puerto Rico Passes New Municipal Reorganization Act*, 128 HARV. L. REV. 1320, 1325 (Feb. 2015) ("The Recovery Act creates an obstacle to achieving Congress's clear intent in passing section 903 of the Bankruptcy Code: to invalidate state municipal reorganization laws.").

Indeed, the widespread consequences of Appellants' arguments are exposed in Appellants' and their *amici's* own briefs. As an initial matter, Appellants' position necessarily would mean that, notwithstanding governing federal law, Puerto Rico and the District of Columbia would be free to enact their own restructuring legislation. As demonstrated by the Recovery Act, because these jurisdictions may have strong short-term (and short-sighted) incentives to shed municipal debt, *see, e.g.*, Amy B. Monahan, *State Fiscal Constitutions and the Law and Politics of Public Pensions*, 2015 U. Ill. L. Rev. 117, 128-29 (2015) (describing politicians' "short time horizons" and tendency to "irrationally favor current needs over future needs" when it comes to public funds), treatment of

17

creditors under such legislation likely would be not only inconsistent with, but also vastly inferior to, that provided under the Bankruptcy Code.[6]

But even more importantly, the absurdity of Appellants' reading of Section 903(1) is highlighted by the fact that, if Appellants are correct, the patchwork of individualized and disparate restructuring laws would extend not only to Puerto Rico and the District of Columbia, but to the *States* themselves -- directly contrary to Congress's express intentions. Appellants and their *amici* claim that, "[b]y its literal terms, section 903 [] does not apply unless a Chapter 9

---

[6]    Indeed, the Recovery Act is just such a statute. Among other things, the Recovery Act, unlike Chapter 9, (i) prohibits "*ipso facto* clauses" -- contractual provisions that terminate parties' obligations upon bankruptcy -- without any exception for derivative contracts (Recovery Act §§ 205(c), 325(a)); (ii) permits a municipal debtor to use or transfer its revenues without providing its creditors adequate protection, even if those creditors have a lien on those revenues (as PREPA's bondholders do here) (Recovery Act §§ 129, 207, 323, 324); (iii) allows a debtor to obtain "priming" senior liens without providing adequate protection to existing lienholders (Recovery Act §§ 206, 322); and (iv) provides that a debtor may recover from or use collateral to pay the costs and expenses of preserving property, regardless of whether doing so was for the benefit of creditors who have security interests in that property (Recovery Act § 129(c)). *See also, e.g.*, Lorraine S. McGowen, *Puerto Rico Adopts a Debt Recovery Act for Its Public Corporations*, 10 PRATT'S J. BANKR. L. 453, 456-57 (Sep. 2014) ("While adopting certain provisions from the Bankruptcy Code, the [Recovery] Act omits several key provisions that are favorable and protective of creditors' rights. These rights ensure that the burdens of a restructuring are shared amongst all stakeholders including the debtor, its creditors and other parties. Thus, the [Recovery] Act creates even more instability and uncertainty for creditors and stakeholders. The consequence of this uncertainty will result in significant litigation, which will only add to the cost and create delays in resolving the financial distress of these public corporations.").

case has actually been filed." Professor Br. at 11; GDB Appellants Br. at 24;

Commonwealth Appellants Br. at 28. Since Puerto Rico's municipalities cannot

file for bankruptcy protection, Appellants argue, Section 903(1) simply does not

apply to them. *See id.* No such "literal terms" exist in Section 903, but if the

Appellants and their *amici* were correct that Section 903(1)'s bar on State

bankruptcy laws does not apply unless and until a Chapter 9 case is actually filed,

States could exempt themselves from Section 903 merely by enacting their own

municipal bankruptcy laws that apply only to municipalities that have not already

sought protection under Chapter 9, or by refusing to authorize Chapter 9 filings by

their municipalities pursuant to 11 U.S.C. § 109(c)(2).

Appellants' argument thus proves far too much: their reading would permit

States *at their option* to pass their own bankruptcy laws in lieu of Chapter 9. This

unquestionably would be an absurd result, plainly contrary to Congress's express

intent to limit States' ability to enact their own municipal bankruptcy laws. *See*

*Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations

of a statute which would produce absurd results are to be avoided.").

Moreover, a ruling that permits the nation's States and territories to enact

their own conflicting sets of municipal bankruptcy laws would be incredibly

harmful to the municipal bond market, and result in the precise harms that

Congress was seeking to prevent in 1946, when it enacted Section 83(i) to ensure

19

that "[o]nly under a Federal law should" a bondholder of a municipality "be forced to accept [] an adjustment [to the municipality's obligations] without his consent," H.R. Rep. No. 79-2246, at 4 (1946); and then again in 1978, when it recodified that prohibition as Section 903(1) in order to avoid "frustrat[ing] the constitutional mandate of uniform bankruptcy laws."  S. Rep. No. 95-989, at 110 (1978). Congress clearly intended Section 903(1) to preempt local municipal bankruptcy laws in the States, and the Recovery Act is an unconstitutional encroachment into an area that Congress expressly prohibited its political subdivisions from reaching.

## II.   APPELLANTS AND THEIR *AMICI* PRESENT A GROSSLY INACCURATE PICTURE OF THE "CATASTROPHES" THAT PURPORTEDLY AWAIT THE CITIZENS OF PUERTO RICO WITHOUT THE RECOVERY ACT

In support of Puerto Rico's appeal, the Appellant *amici* paint an apocalyptic picture of Puerto Rico if the District Court's decision is affirmed.  They argue that the result will include unpaid employees, unmet environmental regulations, and "rolling blackouts" (PREPA Br. at 2), with the territory locked in a "death spiral" of "inordinately high prices" and depopulation (Professor Br. at 19, 23-24). According to *amici*, this chaos and catastrophe is the inevitable and foreseeable result of the "chaotic grab for the assets of public utilities that provide essential services" that would occur absent the Recovery Act.  PREPA Br. at 13; *see also* GDB Br. at 5-6.  Fortunately, each and every element of *amici's* proposed parade

of horribles is manifestly and objectively false -- contradicted by the actual

behavior of Puerto Rico and its creditors, by governing law and applicable

contractual provisions, and by logic and common sense.

### A.    The Recovery Act is Unnecessary to Maintain PREPA's Operations

The case of PREPA -- whose fiscal distress was one of the primary drivers

of the Recovery Act -- makes clear that the enactment of the Recovery Act was not

a "reasonable and necessary" attempt (Op. & Order at 60-62) to facilitate a fair and

orderly restructuring of debts, but apparently was instead an effort by Puerto Rico

to provide its municipalities with more leverage in negotiations with creditors by

abrogating certain of the creditors' rights and remedies.  This leverage evidenced

itself when, after the enactment of the Recovery Act, PREPA bond prices plunged

and its credit rating was slashed, even as negotiations between PREPA and its

creditors continued.[7]

---

[7]   Nick Brown & Tom Hals, *Puerto Rico debt crisis headed for U.S.-style bankruptcy resolution*, REUTERS (July 23, 2014), *available at* http://www.reuters.com/article/2014/07/23/us-puertorico-debt-analysis-idUSKBN0FS0A420140723 (Recovery Act "shocked investors.  Prices on PREPA bonds and those issued by its sister corporations plunged, with some PREPA debt falling by nearly 50 percent in a matter of days.  Credit ratings agencies, which had already cut most Puerto Rico bonds to below-investment grade earlier in the year, slashed them deeper into junk territory, saying the law raised questions about the administration's commitment to honoring its debts").

The Recovery Act was neither reasonable nor necessary; absent the Recovery Act, PREPA could have taken numerous steps to alleviate its fiscal distress, as described by the District Court in its opinion. Op. & Order at 63-64. Among other things, PREPA has the ability to (i) "modestly raise its rates" -- something PREPA is contractually required to do in order to service its debt (Trust Agreement § 502, JA 383-84), but has not done (Op. & Order 63); (ii) collect more than half a billion dollars owed to it by the Commonwealth; (iii) reduce subsidies paid by PREPA to other municipalities; (iv) cut costs and correct inefficiencies; and (v) negotiate with its creditors to restructure its debts on a voluntary basis[8] -- especially since "[t]he Recovery Act was passed before any meaningful attempt to engage in such negotiations." Op. & Order at 64.

In fact, PREPA did take certain of these steps independent of the Recovery Act. As the District Court recognized, a key means for PREPA (and other distressed Commonwealth municipalities) to address its fiscal distress is to reach a negotiated outcome with its creditors consistent with all parties' rights and responsibilities, and negotiations to that end have been ongoing, both before and after the Recovery Act was invalidated by the District Court.

---

[8]   As discussed further below (see infra, § II.C.), the option of negotiating with creditors is particularly significant in light of Chapter 9's requirement that municipalities hold such negotiations before seeking bankruptcy protection. See 11 U.S.C. § 109(c)(5)(B).

PREPA's fiscal troubles first came to a head in July 2014, after rating agencies downgraded PREPA's bonds following enactment of the Recovery Act.[9] In response, PREPA's creditors formed an *ad hoc* committee and entered into a series of forbearance agreements with PREPA.[10]  In exchange for its bondholders' forbearance, PREPA agreed to install a Chief Restructuring Officer ("CRO") to "help[] the Authority achieve fiscal stability, . . . [by] join[ing] the leadership team in reviewing all of PREPA's business processes to address its current challenges and ensure its continued ability to serve the people of Puerto Rico."[11]  On December 15, 2014, PREPA's new CRO issued a report detailing steps that PREPA should take to modernize its operations, provide energy to Puerto Rico's citizens in a more efficient manner, and obtain sufficient cost savings to fully

---

[9]    *See* Robert Slavin, *PREPA Downgraded as Payment Comes Due*, THE BOND BUYER (July 1, 2014), *available at* http://www.bondbuyer.com/news/regionalnews/prepa-downgraded-as-payment-comes-due-1064038-1.html.

[10]    *See* Robert Slavin, *PREPA Bondholder Expects Favorable Restructuring*, THE BOND BUYER (Mar. 23, 2015), *available at* http://www.bondbuyer.com/news/regionalnews/prepa-bondholder-expects-favorable-restructuring-1071633-1.html; Aaron Kuriloff, *Puerto Rico Power Buys Time From Creditors*, WALL STREET JOURNAL (Aug. 14, 2014), *available at* http://www.wsj.com/articles/puerto-rico-power-buys-time-from-creditors-1408062487.

[11]    Michael Aneiro, *Puerto Rico PREPA Utility Names Chief Restructuring Officer*, BARRON'S (Sep. 4, 2014), *available at* http://blogs.barrons.com/incomeinvesting/2014/09/04/puerto-rico-prepa-utility-names-chief-restructuring-officer/.

service PREPA's debt.[12]  On or about March 27, 2015, the *ad hoc* committee of

PREPA's bondholders presented a proposal to PREPA "for nearly $2 billion in

new infrastructure investment."[13]  The proposal would "allow the utility to

modernize its business, a key element in fixing Puerto Rico's ailing economy,"[14]

pay its debt service, meet EPA air quality standards, and "create thousands of

jobs."[15]  Moreover, under the proposal, PREPA's electricity rates would be

stabilized at below the 2014 average[16] -- a far cry from the "inordinately high

prices" forecast by the *amici*.  *See* Professor Br. at 19.  And, most recently, several

months after the Recovery Act was invalidated, on April 9, 2015, PREPA's CRO

stated that she was "optimistic that we will come to a consensual plan with the

---

[12]   *See* Kevin Mead, *Prepa Extends Business Plan to 10 Years*, CARIBBEAN BUSINESS (Apr. 6, 2015), *available at* http://www.caribbeanbusinesspr.com/news/prepa-extends-business-plan-to-10-years-102832.html.

[13]   Lisa Beilfuss, *Puerto Rico Utility Bondholders Unveil $2 Billion Plan*, WALL STREET JOURNAL (Apr. 1, 2015), *available at* http://www.wsj.com/articles/puerto-rico-utility-bondholders-unveil-2-billion-plan-1427918547.

[14]   Nick Brown, *Creditors offer Puerto Rico's troubled utility $2 billion financing*, REUTERS (Mar. 28, 2015), *available at* http://www.reuters.com/article/2015/03/28/us-usa-puertorico-prepa-idUSKBN0MO0VE20150328.

[15]   Robert Slavin, *PREPA's Expected Default Is Now Avoidable*, THE BOND BUYER (Apr. 1, 2015), *available at* http://www.bondbuyer.com/news/regionalnews/no-default-for-prepa-1071897-1.html.

[16]   *Id.*

[forbearing] bondholders that will let PREPA operate efficiently and pay the debts when they come due."[17]

Thus, instead of triggering the "race to the courthouse" predicted by Appellants and their *amici* (*e.g.*, GDB Br. at 5), PREPA's distress triggered a good-faith negotiation between PREPA and its creditors that has resulted in proposals for transforming PREPA into a more efficient utility; instead of leading to "rolling blackouts" and a "death spiral," the distress led to a thorough review of PREPA's operations that has the potential to provide substantial benefits not only to PREPA and its creditors, but to the citizens of Puerto Rico, who will ultimately have a more effective energy provider.

### B.    Creditors Have No Claim on Public Assets

That PREPA's financial distress has led to constructive negotiations, rather than the doomsday scenario predicted by *amici* (including PREPA itself), can be explained by the nature of PREPA's relationship with its bondholders. Unlike most *private* bonds, holders of *public* revenue bonds like those of PREPA do not have a security interest in any of the municipality's assets, or in the municipality itself. Instead, PREPA's bondholders have a lien on PREPA's *revenues*, and an

---

[17]    Robert Slavin, *PREPA Restructuring Officer Optimistic on Consensual Plan*, THE BOND BUYER (Apr. 9, 2015), *available at* http://www.bondbuyer.com/news/regionalnews/prepa-restructuring-officer-optimistic-on-consensual-plan-1072127-1.htm.

undertaking by PREPA that it will maintain rates that permit it to earn revenues sufficient to meet its debt service.  Trust Agreement § 502, JA 383-84.  As a result, (i) bondholders cannot foreclose on or force the sale of PREPA's energy-producing assets or otherwise put PREPA out of business; and (ii) bondholders have a strong incentive to ensure that PREPA continues to operate and earn revenues through the sale of energy to Puerto Rico's citizens, since, if PREPA closed its doors, its bondholders would likely receive almost nothing on their investment.  Thus, the interests of PREPA's bondholders and its customers are aligned.

### C.   Negotiations Based Upon the Pre-Existing Contractual and Statutory Framework Provide the Proper -- and Best -- <u>Framework for Addressing Puerto Rico's Financial Difficulties</u>

PREPA and its bondholders are engaged in ongoing negotiations, which represent the best way for a municipality and all of its stakeholders, including its customers and creditors, to reach a mutually-beneficial compromise that maximizes the recovery to creditors while at the same time ensuring the viability of the municipality.  Indeed, even certain of the Appellants themselves recognize that "*everyone* (*creditors* and residents of the Commonwealth alike) will be worse off if public corporations are unable to continue performing their public functions." GDB Br. at 11 (emphasis added).  In the case of creditors, this is because "no new revenues would be generated that can repay their debts."  *Id.*

26

Congress similarly has recognized this fundamental aspect of municipal restructuring: even in Chapter 9 -- which the *amici* claim is reflective of Congressional intent to prejudice creditors in the case of municipal distress (Professor Br. at 19) -- municipalities must first negotiate in good faith with their creditors before they can be eligible to seek relief under the Bankruptcy Code. *See* 11 U.S.C. § 109(c)(5)(B); *see also In re City of Detroit, Mich.*, 504 B.R. 97, 173 (Bankr. E.D. Mich. 2013) (requiring good-faith negotiations); *In re City of Vallejo*, 408 B.R. 280, 296 (B.A.P. 9th Cir. 2009) (same).[18] As a result of such negotiations, a number of municipalities have achieved satisfactory resolutions of protracted financial distress without resort to changing applicable laws or restructuring debts in bankruptcy.[19] Far from the disarray Appellants portray, in reality there has been a value-enhancing and productive negotiating process -- and

---

[18] Notably, unlike Chapter 9, the Recovery Act does not require that Puerto Rico's municipalities engage in good-faith negotiation with their creditors before seeking protection under the statute. *Compare* Recovery Act § 301, *with* 11 U.S.C. § 109(c)(5)(B).

[19] *See, e.g.*, Sam Roberts, *When New York Teetered on the Brink of Bankruptcy*, NEW YORK TIMES (July 26, 2013), *available at* http://cityroom.blogs.nytimes.com/ 2013/07/25/when-new-york-teetered-on-the-brink-of-bankruptcy/ (describing agreement between New York City and its creditors); Jamie Mason, *Harrisburg, creditors reach debt restructuring deal*, THE DEAL PIPELINE (Sep. 1, 2013), *available at* http://www.thedeal.com/content/restructuring/harrisburg-creditors-reach-debt-restructuring-deal.php (agreement reached between Harrisburg, Pennsylvania and its creditors).

27

the only realistic hope for Puerto Rico and its utilities to put an end to their current financial woes.[20]

But even if negotiations between PREPA and its creditors fail to lead to a negotiated agreement, PREPA's existing statutory framework, incorporated into the trust agreement governing PREPA's bonds, provides mechanisms that are designed to -- and, if invoked, would -- prevent the catastrophe that Appellants and *amici* predict. The primary remedy available to PREPA's bondholders if negotiations fail and PREPA defaults -- at least before the Recovery Act purported to eliminate that remedy -- is the appointment of a receiver. *See* Trust Agreement § 804, JA 411-12; P.R. Laws Ann. Tit 22 § 207(a); *compare* Recovery Act § 108(b) (eliminating right of bondholders to seek receiver).

The rules governing this remedy reflect a recognition of the fundamental interest PREPA's bondholders have in maintaining (and, in fact, enhancing) PREPA's ability to provide services to Puerto Rico's citizens. A receiver is appointed by, and reports to, a Commonwealth court -- not to PREPA's bondholders. P.R. Laws Ann. Tit 22 § 207(a) & (d) (1941). The receiver's powers are specifically "limited to the operation and maintenance of [PREPA's energy-

---

[20]    One reason that there has been -- and will be -- no "race to the courthouse" is that both Puerto Rico law and the Trust Agreement governing PREPA's bonds both require that the exercise of remedies against PREPA be "for the equal benefit and protection of all holders of bonds similarly situated." P.R. Laws Ann. Tit 22 § 208(a); Trust Agreement § 808, JA 414-15.

generating facilities], and the collection and application of the income and revenues therefrom," and the receiver is expressly prohibited from selling PREPA's assets.  *Id.* § 207(e).  In other words, even in the purported "doomsday" scenario painted by Appellants, PREPA will continue to operate and provide electricity to its customers, as directed by a receiver answering not to PREPA's creditors, but to a local judge.

The existence of this statutory and contractual framework, designed to ensure that PREPA continues to operate, while ensuring that PREPA's creditors are treated fairly and are paid in an orderly manner, demonstrates the manifest falsity of the claim of Appellants and their *amici* that the District Court's decision striking down the Recovery Act "bars Puerto Rico from implementing any orderly process to enforce claims against distressed public corporations."  GDB Br. at 13. Just such a process exists, and has existed in Puerto Rico's statutes for more than 70 years.

The benefits of the appointment of a receiver under such circumstances have been proven.  *See, e.g.*, DeBonis, *supra* n.5 (noting that panel appointed by Congress in District of Columbia was "overwhelmingly successful" in reversing District's financial distress and "turn[ing] the city around").  Most recently, the city of Harrisburg, Pennsylvania successfully exited a state receivership last year after implementing a recovery plan that "[m]unicipal-finance experts said… could

29

serve as a model for other cities." Kris Maher, *Harrisburg Will Exit State Receivership*, WALL STREET JOURNAL (Feb. 26, 2014), *available at* http://www.wsj.com/articles/SB10001424052702304709904579407431943602344. The receiver was appointed by the city in the face of financial distress, after a failed attempt to file bankruptcy; with the receivership complete, the city is expected to have "balanced budgets for the next three years." *Id.*

Similarly, in 2010, a receiver was appointed to oversee the sewer system of Jefferson County, Alabama, which, like PREPA, had faced years of mismanagement that threatened its ability to pay its debt service. *See In re Jefferson County, Ala.*, 474 B.R. 228, 238-40 (2012). Although Jefferson County ultimately sought Chapter 9 bankruptcy protection, the bankruptcy court overseeing the case recognized that the receiver provided significant value to the sewer system's creditors *and* its customers: "The evidence indicates that the Receiver has done a much better job during his tenure than was done by the County during the tenures of its former county commissioners." *Id.* at 243. Moreover, the receiver "acted as a go between" in efforts by the County and its stakeholders "to resolve the sewer system related debts of the County." *Id.* at 244. The receiver's involvement led to a compromise that would have reduced the system's indebtedness and refinanced its remaining debt, had the county not filed for bankruptcy. *See id.*

30

As these examples vividly illustrate, even the appointment of a receiver --
the last-resort option of PREPA's bondholders upon a default -- would lead
productively toward addressing the interests of all of PREPA's stakeholders in
keeping PREPA operating, and serving the people of Puerto Rico.  These interests
are embodied in the terms of the Trust Agreement and Puerto Rico's receivership
law, and are plainly demonstrated by the months of good-faith negotiations that
have followed PREPA's financial distress.

## CONCLUSION

For the foregoing reasons, the District Court's grant of summary judgment to Plaintiffs-Appellees, and the District Court's injunction barring enforcement of the Recovery Act, should be affirmed.

Dated:     April 15, 2015
   New York, New York

     Respectfully submitted,

     KASOWITZ, BENSON, TORRES
       & FRIEDMAN LLP

     By:  /s/ Marc E. Kasowitz
       Marc E. Kasowitz (mkasowitz@kasowitz.com)
       Daniel R. Benson (dbenson@kasowitz.com)
       Hon. Joseph I. Lieberman (Ret.)
       (jlieberman@kasowitz.com)
       Hon. Clarine Nardi Riddle (Ret.)
       (cnriddle@kasowitz.com)
       Andrew K. Glenn (aglenn@kasowitz.com)

     1633 Broadway
     New York, N.Y. 10019
     Tel.:   (212) 506-1700
     Fax:   (212) 506-1800

     *Attorneys for the Association*
     *of Financial Guaranty Insurers,*
     *As Amicus Curiae*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)

This brief complies with the type-volume limitation of Fed. R. App.

P. 32(a)(7)(B) and Local Rule 29 because this brief contains 7,000 words,

excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  This

brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the

type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been

prepared in a proportionally spaced typeface using Microsoft Word version 2007 in

fourteen point, Times New Roman font.

Dated:    April 15, 2015
          New York, New York

                    KASOWITZ, BENSON, TORRES
                      & FRIEDMAN LLP
                    _____/s/ Marc E. Kasowitz_____
                     Marc E. Kasowitz
                     (mkasowitz@kasowitz.com)

                    1633 Broadway
                    New York, N.Y. 10019
                    Tel.:  (212) 506-1700
                    Fax:  (212) 506-1800

                    *Attorneys for the Association*
                    *of Financial Guaranty Insurers*,
                    *As Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2015, I served the foregoing brief upon the following counsel by ECF and/or First Class U.S. Mail:

Alejandro Febres-Jorge, Esq.
GOVERNMENT DEVELOPMENT
  BANK FOR PUERTO RICO
Roberto Sánchez Vilella
Government Center
De Diego Avenue No. 100
Santurce, PR 00907-2345
(787) 729-6438

Martin J. Bienenstock, Esq.
Sigal P. Mandelker, Esq.
Mark D. Harris, Esq.
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
(212) 969-3000

*Counsel for Defendant-Appellant Government Development Bank for Puerto Rico*

Margarita Mercado-Echegaray, Esq.
Solicitor General
COMMONWEALTH OF
  PUERTO RICO
P.O. Box 9020192
San Juan, PR 00902-0192
(787) 724-2165

Christopher Landau, Esq.
Beth A. Williams, Esq.
Michael A. Glick, Esq.
Claire M. Murray, Esq.
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC 20005
(202) 879-5000

*Counsel for Defendant-Appellants Alejandro Garcia-Padilla, et al.*

Manuel Fernández-Bared, Esq.
Linette Figueroa-Torres, Esq.
TORO, COLÓN, MULLET,
  RIVERA & SIFRE, P.S.C.
P.O. Box 195383
San Juan, PR 00919
(787) 751-8999

Thomas Moers Mayer, Esq.
Philip Bentley, Esq.
David E. Blabey Jr., Esq.
KRAMER LEVIN NAFTALIS
  & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
(212) 715-9100

*Counsel for Plaintiffs-Appellees Franklin Cal. Tax-Free Trust, et al.*

<div style="display:flex; justify-content:space-between;">
<div>

David C. Indiano, Esq.
Jeffrey M. Williams, Esq.
Leticia Casalduc-Tabell, Esq.
INDIANO & WILLIAMS, P.S.C.
207 Del Parque St., 3d Floor
San Juan, PR 00912
(787) 641-4545

</div>
<div>

Theodore B. Olson, Esq.
Matthew D. McGill, Esq.
Matthew J. Williams, Esq.
Scott G. Stewart, Esq.
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave, NW
Washington, DC 20036
(202) 955-8500

</div>
</div>

*Counsel for Plaintiffs-Appellees BlueMountain Management, LLC, et al.*

<div style="display:flex; justify-content:space-between;">
<div>

Jorge R. Roig, Esq.
Joanne A. Tomasini-Muñiz, Esq.
GONZÁLEZ, MACHADO
  & ROIG, LLC
Citibank Tower, Suite 601
252 Ponce de León Avenue
San Juan, PR 00918
(787) 773-6363

</div>
<div>

Lawrence B. Friedman, Esq.
Richard J. Cooper, Esq.
Lewis J. Liman, Esq.
Sean A. O'Neal, Esq.
CLEARY GOTTLIEB STEEN
  & HAMILTON LLP
One Liberty Plaza
New York, NY 10006
(212) 225-2000

</div>
</div>

*Counsel for Amicus Curiae Puerto Rico Electric Power Authority*

Gabriel R. Avilés-Aponte, Esq.
TAPIA & AVILÉS
Cond. First Federal, Suite 601
Ave. Muñoz Rivera #1056
San Juan, PR 00927
(787) 764-1430

*Counsel for Amicus Curiae Professors Clayton P. Gillette And David A. Skeel, Jr.*

Edilberto Berríos Pérez, Esq.
REC Law Services PSC
#239 Arterial Hostos Ave., Suite 900
Capital Center Bldg.
San Juan, PR 00918-1400
(787) 753-0884

*Counsel for Amicus Curiae Edilberto Berríos Pérez, Esq.*


Dated:     April 15, 2015
           New York, New York


KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP
_____/s/ Marc E. Kasowitz_____
  Marc E. Kasowitz
  (mkasowitz@kasowitz.com)

1633 Broadway
New York, N.Y. 10019
Tel.:  (212) 506-1700
Fax:  (212) 506-1800

*Attorneys for the Association
of Financial Guaranty Insurers,
As Amicus Curiae*

36